## Case No. 8,230.

### In re LELAND et al.

[7 Ben. 156; [1] 9 N. B. R. 209.]

District Court, S. D. New York. Feb., 1874.

FRAUDULENT PREFERENCE—WHAT CREDITORS MAY
NOT PROVE THEIR DEBTS—SURRENDER
OF SECURITY—PARTY.

1. L. & Co. executed a mortgage upon real estate to trustees, as security for certain bonds issued by them. They afterwards went into bankruptcy, and an assignee was appointed. The assignee petitioned the court for an order for the sale of the real estate. and the mortgagees, in open court, surrendered their claim to the possession of the property to the assignee, but without relinquishing, or in any manner affecting, the validity and lien of the mortgage on the proceeds of the sale. The property was sold by the assignee, and the money paid into court. An order was then made for an examination as to the validity of the various liens claimed on the proceeds, and the court, on the hearing of that matter, held that the mortgage above named was void, as having been given by L. & Co. while insolvent, and within four months before the filing of the petition against them, with a view to give a preference to certain of their creditors, the creditors and the trustees having reasonable cause to believe that L. & Co. were insolvent and that such mortgage was made in fraud of the bankruptcy act. Certain of the bondholders thereafter applied for leave to surrender their bonds and file new proofs of debt, as debts without security, for the purpose of sharing as general creditors in the estate. One of the bondholders. R., had originally filed a proof of debt as a debt without security. This debt was re-examined, and, on the the re-examination, it appeared that he had not surrendered his bonds, and had taken part in the proceedings taken by the trustees to establish the validity of their mortgage as a lien on the proceeds: *Held*, that, under the 39th section of the bankruptcy act [of 1867 (14 Stat. 536)], an assignee has power to recover back property in all cases where a person has conveyed property contrary to the act and is afterwards adjudged a bankrupt.

[Cited in Re Dakin, Case No. 3,539.]

2. Under this section. if the assignee recover back the property because it was conveyed by the bankrupt with intent to prefer the creditor, and because the creditor had reasonable cause to believe what is specified in that regard, in that section, such creditor is not allowed to prove his debt in bankruptcy.

[Followed in Re Leland, Case No. 8.235.]

3. This provision of the 39th section is to be construed in connection and in harmony with the provision of the 23d section; and there cannot be such a surrender by the creditor, as is spoken of in the 23d section. after there has been a recovery of the property by the assignee under the 39th section, or under the 35th section.

4. In this case, there had been such a recovery by the assignee, although there had been no direct suit by him against the creditors; because. it had been necessary for the assignee to obtain a legal adjudication, not indeed giving him the possession of the property. but declaring the invalidity of the lien which the creditors claimed to hold upon it.

[Distinguished in Field v. Baker, Case No. 4,-762.]

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

5. It was too late for the creditors to surrender their preferences. because the order declaring the mortgage an invalid one made it res adjudicata that, as to those who took part in the proceeding. the facts existed which authorized the assignee to recover back the property.

6. Such creditors, therefore. were debarred from proving their debts in the bankruptcy proceedings.

7. R. had been a party to the proceedings taken by the trustees to sustain the validity of the mortgage, and his proof of the debt for which he had taken the bonds as security must be stricken out.

[In the matter of Simeon Leland, Warren Leland, and Charles Leland, composing the firm of Simeon Leland & Co., bankrupts. A petition in bankruptcy was filed in the district court for the Western district of New York against Warren and Charles Leland, composing the firm of Leland Bros. At this time bankruptcy proceedings were pending in this district against these two and Simeon Leland, composing the firm of Simeon Leland & Co. The district court for the Western district dismissed the petition, so that the matters might all be adjudicated together in this district. Case No. 8,228. Leland Bros. mortgaged their Saratoga Springs Hotel property to secure certain bonds made by them. These bonds are considered in Case No. 8,229. Chattel mortgages of Nichol & Davison on certain fixtures of the hotel property were construed and declared void in Case No. 8,234. A decree was entered November, 1873, declaring the mortgages upon the real estate to be void. The case is now heard upon petition of those holding the bonds secured by these void mortgages to be allowed to prove their debts.]

T. M. North, for assignee.
C. B. Sedgwick, for Rouse.
D. Campbell, for A. T. Stewart & Co.
S. G. Courtney, for Monteath & Son.
O. Smedberg, for Paulding, Kemble & Co.

BLATCHFORD, District Judge. In this matter, an order was made by this court, on the 10th of February, 1872, reciting that Edward B. Wesley, as assignee of the bankrupts, had theretofore filed his petition in this court, setting forth that the Grand Union Hotel, situated at Saratoga Springs, was owned by Warren Leland and Charles Leland, two of the bankrupts constituting the firm of Leland Brothers, and that a sale of the said property was necessary, and praying the direction of the court in regard to a sale thereof, and also reciting that, after the filing of such petition, this court had removed Wesley from his office as assignee, and had appointed John H. Platt as assignee in his stead, and that counsel for the assignee and for Alexander T. Stewart and others, and D. McMahon as counsel for Edward B. Wesley and D. Randolph Martin, as mortgagees in trust of the premises in question, under two trust mortgages mentioned in said petition, had been heard, and

that said Wesley and Martin, as such mortgagees in trust, had, in open court, for the purpose of enabling said property to be lawfully sold and proper title therefor given, surrendered their claim to the possession of the said premises to the assignee, without relinquishing or in any manner affecting the validity and lien of their several trust deeds on the proceeds of such sale, and that said assignee was then in actual and undisputed possession thereof, and there was no adverse claimant to the possession, and then ordering, that the assignee sell at auction, in one parcel, the said real estate, describing it, free and clear of all liens and incumbrances which had attached to the premises since the 30th of September, 1865 (the said two trust mortgages having attached thereto since that date), and that such liens and incumbrances were thereby transferred to the net proceeds of such sale, and that the fund produced by such sale should stand in the place and stead of said real estate for all purposes, so far as respected said liens and incumbrances, and subject thereto, and that the net proceeds of the sale be deposited on interest to the credit of this matter, to abide the further order of this court, not to be drawn out without notice to the said trustees or their attorneys, and that, for the purpose of marshaling the proceeds of said sale, assets of the said bankrupts, among the different lien claimants, whether by mortgage or otherwise, to said fund, it be referred to the register, after the completion of the purchase under the sale, to take any evidence which the parties in interest, or any of them, might offer or introduce before him, upon the validity of the various liens and incumbrances existing or claimed to exist upon the property ordered to be sold, the extent to which such liens are valid, if valid only in part, the amount due or secured by each of such liens or incumbrances, the persons in whose favor such liens exist, or to whom such amounts are due or secured, and the dates at which such amounts became or will become due, also as to the nature, situation and value of the said real estate, and whether the said liens and incumbrances cover the whole thereof, and what portions, if any, are affected by some of said liens and not by others, and that the said register have authority to issue summons for witnesses and orders for the attendance of the bankrupts, with the same effect as on the examination of bankrupts according to the bankruptcy act. and the rules and practice of this court, and that the bankrupts attend upon such order, and that all witnesses attend upon such summons, and that reasonable notice of such reference be given to all parties claiming any interest in said proceeds of sale. and that the said register report the evidence so taken to this court, and that, until the coming in and confirmation of said report.

the said moneys remain on deposit as aforesaid, at interest.

The premises in question were sold, and the net proceeds of sale were deposited, and the reference so provided for was had, a large body of testimony being taken. The matter was brought to a hearing on such testimony, and on the 1st of November, 1873, the court made an order, which recites the provisions of the former order and that the sale had been had and the proceeds had been deposited, and then proceeds: "And all the persons and corporations hereinafter named having attended in person or by counsel upon the said reference before the said register, and the said register having taken all the evidence offered or introduced by them respectively, as to the liens and incumbrances claimed by them respectively, * * * and the said register having reported to this court the testimony so taken, and the matter having been brought on for final hearing before this court * * * and all the persons and corporations hereinafter named * * * having appeared upon said hearing by their respective counsel, and having, in open court, waived all objections to the form of the proceedings, and submitted all the questions involved herein to the decision and decree of the court * * * and after hearing * * * counsel for Alexander T. Stewart & Company * * * and D. McMahon, of counsel for all the other persons and corporations hereinafter mentioned * * * this court * * * does hereby order, adjudge and decree * * * that the mortgage upon said Grand Union Hotel property, commonly called the second mortgage" (being one of the two trust mortgages mentioned in the order first above mentioned), "dated November 1st, 1870, executed by Warren Leland and Charles Leland to Edward B. Wesley and D. Randolph Martin, in trust to secure certain bonds commonly called second mortgage bonds, was made, executed and delivered by said Warren Leland and Charles Leland, being insolvent, within four months before the filing of the petition in bankruptcy against them, with a view to give a preference to certain of their creditors, and, among others, to * * * A. T. Stewart & Company, Simeon Rouse, Paulding, Kemble & Co. * * * Monteath & Son * * * holders of bonds issued under and purporting to be secured by said mortgage, the said Edward B. Wesley and D. Randolph Martin receiving such conveyance, and the said bondholders above named to be benefited thereby, having reasonable cause to believe that the said mortgagors were insolvent, and that such mortgage was made in fraud of the provisions of the bankruptcy act, and that said mortgage is not a valid lien upon or security against said property, nor upon or against said fund in court, and that the bonds issued under the provisions of said mortgage are not liens upon, and are not entitled to be paid out of, said fund, that Edward B. Wesley and D. Randolph Martin, claimants,

as trustees under said mortgage, are not entitled to any lien upon said fund, nor to be paid any money therefrom, that * * * A. T. Stewart & Co., Simeon Rouse, Paulding, Kemble & Co. * * * Monteath & Son * * * claimants, as holders of bonds issued to them respectively, under the provisions of said mortgage, are not, nor is either of them, entitled to any lien upon said fund, or to be paid any money from said fund."

The 23d section of the bankruptcy act provides, that any person who, after the approval of this act, shall have accepted any preference, having reasonable cause to believe that the same was made or given by the debtor contrary to any provision of this act, shall not prove the debt or claim on account of which the preference was made or given, nor shall he receive any dividend therefrom until he shall first have surrendered to the assignee all property, money, benefit or advantage received by him under such preference." The 35th section of the same act provides, "that, if any person, being insolvent, * * * within four months before the filing of the petition by or against him, with a view to give a preference to any creditor, * * * makes any * * * transfer or conveyance of any part of his property, * * * the person receiving such * * * transfer or conveyance, or to be benefited thereby, * * * having reasonable cause to believe that such person is insolvent, and that such * * * conveyance is made in fraud of the provisions of this act, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it or so to be benefited." The 39th section of the same act provides, "that any person residing and owing debts as aforesaid, who, after the passage of this act, * * * being * * * insolvent, * * * shall make any * * * conveyance or transfer of * * * property, * * * with intent to give a preference to one or more of his creditors, * * * shall be deemed to have committed an act of bankruptcy, and, subject to the conditions hereinafter prescribed, shall be adjudged a bankrupt, * * * and, if such person shall be adjudged a bankrupt, the assignee may recover back the * * * property so * * * conveyed * * * or transferred contrary to this act, provided the person receiving such * * * conveyance had reasonable cause to believe that a fraud on this act was intended and that the debtor was insolvent, and such creditor shall not be allowed to prove his debt in bankruptcy."

A. T. Stewart & Co., Rouse, Paulding, Kemble & Co., and Monteath & Son, the persons named in the above order, now present for determination the question whether they are or are not entitled to prove, in bankruptcy, the debts for which they received as security the bonds referred to, secured by such mortgage. They all of them have valid debts, but, by said order, the mortgage is declared to have been made in fraud of the act, and not to be a valid lien on the property or on the fund in court, and the bonds issued under the mortgage are declared not to be liens on the fund, and the terms of the order declare the existence of facts which, under the 35th and 39th sections of the act, give the assignee the right to recover back the property transferred.

The proper construction of the 39th section seems to me to be, not that it gives power to the assignee to recover back property conveyed contrary to the act, only when the bankrupt is adjudged an involuntary bankrupt because of the conveyance of such property as an act of bankruptcy, or even only when he is adjudged an involuntary bankrupt, but that it gives such power to recover back in all cases where a person has conveyed property contrary to the act, and is afterwards adjudged a bankrupt. Under such construction, it is of the same scope, in regard to the recovery or recovery back of property, as the 35th section. But, the 39th section contains the further provision, not found in the 35th section, that "such creditor shall not be allowed to prove his debt in bankruptcy." This means, the creditor to whom the preference was given by the conveyance, when the assignee recovers back the property transferred contrary to the act. The entire provision of the 39th section is to the effect, that, if a person has conveyed property contrary to the act, and if he is afterwards adjudged a bankrupt, the assignee (as to transactions within the times limited by the 35th section) may recover back the property, and that, if the conveyance is one for preference to a creditor, and if the assignee recovers back the property conveyed, because it was conveyed by the bankrupt with intent to prefer such creditor, and because such creditor had reasonable cause to believe what is specified in that regard in the section, such creditor shall not be allowed to prove his debt in bankruptcy. This provision is to be construed in connection, and in harmony, with the provision of the 23d section, before cited. If, under the 23d section, the preferred creditor were allowed to surrender to the assignee the property received in preference, even after it had been recovered back by the assignee, as mentioned in the 39th section, so as to be able to prove his debt, no creditor taking a preference would ever be debarred from proving his debt. If, under the 39th section, it were held that the mere taking of a preference by a creditor would debar him from proving his debt, without the precedent necessity for a recovery back by the assignee of the property conveyed in preference, there never could be any scope for the operation of the 23d section in respect to a surrender. The interpretation heretofore

given by this court to these provisions of the 23d and 39th sections has been (In re Davidson [Case No. 3,599]) that the clause in the 39th section, in respect to not allowing the creditor to prove his debt in bankruptcy, applies only to cases in which the assignee is compelled to resort to legal proceedings to recover the property transferred in violation of the act; that the creditor who claims to retain the property makes himself conclusively a party to the fraud against the act, by resisting the claim of the assignee to recover the property, in case the assignee is successful; but that, where the creditor avails himself of the locus poenitentiae given to him by the 23d section, by voluntarily surrendering the property to the assignee, he ceases to be a party to the fraud, and may prove his debt in bankruptcy and receive dividends on it. This view is concurred in by Judge Longyear, in Re Scott [Case No. 12,518], and in Re Kipp [Id. 7,836]; by Judge Deady, in Re Walton [Cases Nos. 17,128, 17,130]; by Judge Hopkins, in Re Stephens [Case No. 13,365]; and by Judge Dillon, in Re Richter [Id. 11,803]. It being impossible, therefore, that there should be such a surrender as is referred to in the 23d section after there has been a recovery by the assignee under the 35th section, or a recovery back by him under the 39th section, the question is presented, whether, in respect to the creditors named, there has been such a recovery, or such a recovery back, of property transferred as a preference for such creditor.

It is contended, for the creditors, that a direct suit by the assignee against them is necessary, and a recovery of property from and out of their possession by a decree to that effect in such suit, in order to constitute the recovery referred to in the statute. This is not so. The assignee, in this case, has recovered back the property. He has recovered it back free and clear from the preferences, and against the efforts of these creditors to establish such preferences, in a litigation instituted and carried through by him, with a view to recover back the property. In order to recover back the property, it was necessary for him, not merely to obtain possession of the real estate, so as to be able to turn it into money, but to go further and obtain an adjudication that he was to enjoy the fruits of the sale free from any lien of the preferences. Until the latter adjudication, his recovery back was not complete. By the 35th section, it is declared, that the preference shall be void and the assignee may recover the property. Until there is substantially an adjudication as to the invalidity of the preference, there can be no recovery of the property free from the preference. Mere possession of the property by the assignee is not a recovery of it, unless he obtains such an adjudication as to the preference. This is the case under both

the 35th and 39th sections, although the latter section says nothing as to any preference being void, but only speaks of a recovery back by the assignee. But the two sections are substantially one, and are to be construed together in regard to the invalidity of transfers and a recovery by the assignee of property transferred.

In the present case, the assignee, by petition, instituted the proceedings for a sale of the real estate, which have resulted in such sale, and, through the order of reference and the litigation thereunder, in the order of November 1st, 1873. The mortgagees in trust surrendered to the assignee their claim to the possession of the premises, but they surrendered nothing else, and they surrendered that, as the order of February 10th, 1872, expressly states, for the purpose of enabling the property to be lawfully sold, and proper title therefor given, without relinquishing or in any manner affecting the validity and lien of their trust mortgage on the proceeds of sale; and the lien and encumbrance of such trust mortgage was, by such order, transferred to the net proceeds of the sale, and it directed that the fund produced by the sale should stand in place of the real estate for all purposes, so far as respected such lien and encumbrance, and subject thereto. The reference to ascertain the liens on the property and the fund, and marshal the fund, under the power given to the court by the 1st section of the act, was, to all intents and purposes, a litigation to which the bondholders were parties, if they consciously came in, either directly or through the mortgage trustees, asserting and maintaining, against the resistance of the assignee, their right to maintain their preference. Undoubtedly, even after the order of reference was made and the property was sold, they might have surrendered their preferences. But, if they were parties to the litigation in the reference, they are bound by the order of November 1st, 1873, and it is too late for them now to surrender their preferences, because the terms of that order make it res adjudicata between them and the assignee, that the facts existed, as respects them, which gave the assignee the right to recover back the property and its proceeds, and that he has so recovered it back, so that it must follow that they must be debarred from being allowed to prove the debts in respect of which they accepted the preferences. That order recites that the four creditors attended in person, or by counsel, upon the reference, that the register took all the evidence offered or introduced by them respectively as to the liens and encumbrances claimed by them respectively, that they appeared by their respective counsel upon the final hearing of the matter before the court, and waived, in open court, all objections to the form of the proceedings, and submitted all the questions involved to

the decision and decree of the court, and were heard by counsel, who are named. Then follows the judgment of the court. After this, it is too late to go behind such final order, on this question as to the provability of the debts, and inquire whether the evidence warranted such order, provided the four creditors were parties to the litigation, so as to be bound by it.

As to A. T. Stewart & Co., it is not alleged that they did not appear on the reference, or that they did not endeavor, by testimony introduced by them, to maintain their preference, or that they did not so contend, by counsel, on the hearing, or that they did not continue their resistance to the asserted claims of the assignee until after the final order was made. The same is true as to Monteath & Son, and Paulding, Kemble & Co. The motion of A. T. Stewart & Co., for leave to withdraw their former proof of debt, and file in place thereof a new proof of debt, without security, must be denied. The assignee has done nothing to waive the benefit of the final order, or to debar himself of the right to insist that A. T. Stewart & Co. shall not be allowed to prove their debt. The motion of Monteath & Son, for leave to surrender their bonds, and to have their proof of debt, which has been stricken out, restored, and then amended, so as to be an ordinary proof of debt, without security, or for leave to prove their claim anew, as an unsecured claim, is denied. As to Paulding, Kemble & Co., the issues certified are determined in favor of the assignee, and their second proof of debt must be expunged.

As to Rouse, the case comes up on issues as to whether he can be allowed to prove the debt for which he received the mortgage bonds as security, and whether the proof he has made, and which is under re-examination before the register, should be diminished by rejecting such debt. He also applies, by petition, for the opening of the order of November 1st, 1873, and its modification, so as to give him the right to claim a dividend on such debt, and to be paid such dividend as upon an unsecured debt. The facts in the case of Rouse are somewhat peculiar. He resides in Syracuse, N. Y. On the 1st of January, 1872, he went before the register in bankruptcy at Syracuse, and signed and swore to, before him, a proof of debt against Charles Leland and Warren Leland, two of the bankrupts, based on two drafts, for $3,000 each, drawn on the said two bankrupts, as Leland Brothers, and accepted by them (being the two acceptances for which he held the mortgage bonds as collateral security), and also on a promissory note for $632.06, made by the said two bankrupts, as Leland Brothers. The proof set forth that Rouse had not received any security for the drafts or note. The original drafts and note were annexed to the proof. The said register certified on the proof that it was satisfactory to him. The proof found its way into the hands of the assignee, but when does not appear. The reference as to the disposition of the proceeds of sale of the property commenced on the 22d of May, 1872, the record for that day stating that Mr. D. McMahon appeared for the trustees under the mortgage, and for certain named claimants of the fund, the name of Rouse not being among them. On the 8th of July, 1872, Mr. McMahon, subscribing himself as "counsel for the trustees," sent a letter to the Syracuse National Bank at Syracuse, saying that he understood it held bonds of the Grand Union Hotel at Saratoga, and that preparation was being made to distribute the fund arising from the sale of the property, and asking the bank to cause the bonds held by it to be presented at his office on the 11th of July, with the checks given in payment therefor, and evidence of ownership, as the inquiry in relation to said bonds would be proceeded with at that time. The bonds intended were those held by Rouse, and the bank communicated to Rouse the contents of the letter. Rouse, on the 10th of July, sent the bonds by express to Mr. McMahon, with a letter, saying: "Inclosed find bonds of Lelands, held by me. After paying expenses on them, send me my dividend, to my address, in draft or certified check." The bonds, six in number, were received by Mr. McMahon on the 12th or 13th of July, and the express charges, $4.50, not having been prepaid, were paid by him. The record, under date of November 26th, 1872, contains this entry: "Counsel for trustees, on their behalf, and on behalf of S. Rouse, a claimant under second coupon bond mortgages, produces and offers in evidence on behalf of said Rouse the following second mortgage bonds, which are read in evidence and marked as follows," being six bonds of $1,000 each. On the 30th of November, Mr. McMahon, subscribing himself as "counsel for the trustees," sent a letter to Rouse, saying that the reference would be proceeded with on the 6th of December, and adding: "Please attend at that time with your notes or account for which the bonds now in my hands are held by you." Rouse went to New York, and, on the 5th of December, had an interview with Mr. McMahon. As part of it, Mr. McMahon gave to Rouse a letter to the assignee, dated December 5th, saying: "Mr. S. Rouse, one of the creditors of Leland Bros., wishes to get his proof of debt and to exhibit it to me. Please to let him have it, so as to see me about it." Rouse presented this letter to the assignee, and received from him the proof of debt, with the drafts and note attached, and gave a receipt therefor to the assignee, dated December 5th. The proof of debt and the attached papers were given by Rouse to Mr. McMahon, and remained in the hands of the latter until the 16th of December, 1873, the

day the order was made by the register for the re-examination of the claim of Rouse, when they were returned to the assignee by Mr. McMahon. On the 6th of December, 1872, Rouse was examined as a witness on the reference. The record of that day says: "Counsel for trustees, on their behalf, and on behalf of S. Rouse, a claimant, calls the said Rouse." He was then sworn, and testified, on direct and cross-examination. On the direct, this testimony is found: "Q. Are you the owner and holder of any second mortgage bonds on the Union Hotel, at Saratoga, and, if so, produce them? A. I own and hold the six bonds now produced," being the bonds before mentioned. He then went on to say that he took the bonds as security for the two acceptances. The original acceptances, with the notarial certificates of protest attached, and the note, were then put in evidence, detached from the proof of debt, and without any mention of any proof of debt. Rouse then went on to state the facts connected with his receiving the bonds, and after saying that the acceptances and the bonds had passed into the hands of the Syracuse National Bank, and that he had taken up the acceptances in 1871, he added: "I have been the holder of these bonds and these pieces of paper ever since. I never received anything on them, and the amount now due me, for which I hold the bonds, is $6,000, and interest from the respective dates of their maturity." He is then asked, whether, in taking the bonds, he intended to defraud the creditors of the bankrupts, and says he did not; and whether, in taking them, he designed to gain a preference over any of the creditors of the bankrupts, and says he did not; and what was his knowledge or belief, as to the solvency or insolvency of the bankrupts, when he took the bonds, and answers; and whether he knew anything about the provisions of the bankruptcy act, and says he did not; and whether he intended, by taking the bonds, to commit any fraud on the provisions of said act, or to defeat or delay its operation, as regarded the bankrupts and their creditors, and says he did not; and what belief he had as to the existence of any intent, on the part of the bankrupts, to dispose of their property in his favor, in fraud of said act, so as to prevent it from coming to the assignee, or from being distributed under said act, or to defeat or delay the operation of said act, and says he had none; and what cause he had to believe, and what knowledge or information he possessed tending to cause a belief, in the existence of any such intent, and says he had not any; and what belief he had, when or before he took the bonds, as to the existence of any intention, view or desire, on the part of the bankrupts, to give him a preference, and says he had not any. He was cross-examined, at considerable length, as to the facts connected with his taking of the bonds, and bearing on

the inquiries so made of him on his direct examination. On the 30th of July, 1873, the testimony on the reference having been closed, and the matter being about to come on for hearing, Mr. McMahon wrote a letter to Rouse, inclosing to him a copy of a printed circular, subscribed by Mr. McMahon, as "counsel for trustees and claimants," and addressed to "the owners and holders" of said bonds, which circular said: "It is necessary that due preparation should be made to present your rights and interests before said court. The trustees have no funds in hand out of which to pay counsel, and as I, their counsel, have fully prepared myself to advocate your several rights and interests, and have heretofore presented your proofs on the reference, they instruct me to say to you to make the necessary arrangements with me for counsel fees. In case you prefer other counsel, you, of course, are at liberty to employ them, settling up with me for the services already rendered in your behalf." In connection with this circular, Mr. McMahon suggested to Rouse to send him 5 per cent. on the amount of the bonds, or $300. Rouse, by a letter dated August 4th, replied, saying: "It strikes me that it is proper for the trustees of the second mortgage to defend their trust. If they have not funds or credit sufficient to employ counsel, then they should call the creditors together, and let them make arrangements to take care of themselves and employ their own counsel. I presume the matter will be properly seen to, and that suitable compensation will be made, but I am not, as at present advised, disposed to advance $300 on my bonds." Mr. Rouse paid nothing. The matter was argued in September, Mr. McMahon arguing in support of the claim of Rouse, as holder of the six bonds, to share in the proceeds of sale.

Rouse now takes the ground, that he proved his debt as an unsecured debt, intending thereby to surrender the bonds and all claim under them to any preference; that he supposed and believed he had done all that was necessary to that end; that in this he acted in good faith, under the advice of the register in bankruptcy in Syracuse; that he never has claimed, or intended to claim or secure, any preference on the bonds, but fully intended to surrender them and all claims upon or under them; that the undertaking by the trustees to establish the validity of the bonds, and to secure a lien thereunder, and the employment by them of counsel for that purpose were without his concurrence or consent; that, in sending his bonds to Mr. McMahon, as counsel for the trustees, he supposed that Mr. McMahon had a right to ask for them, and considered them as of no further use or value; that the testimony he gave was given at the request of the counsel for the trustees, to show the good faith of the transaction on which he received the bonds and of his debt; that he

employed no counsel, and refused to recognize Mr. McMahon as his counsel, or as acting on his employment, and has never expected to rely upon anything except his original proof of his debt as an unsecured debt; that, by proving his debt as an unsecured debt, he relinquished and surrendered all claim upon the bonds; that he made such proof understandingly and advisedly; and that what was done by the trustees or their counsel cannot affect his rights, unless the proceedings were taken at his instance, or were prosecuted by his direction, or with his conscious consent.

Mr. Gott, the register in bankruptcy in Syracuse, testifies, that Rouse came before him with the acceptances and the note, and stated that he had some mortgage bonds which he had taken as security for his debt, but which he did not consider of any value; that, at the request of Rouse, he, the register, wrote to a correspondent in New York, to ascertain the value of said security, and was advised by him that such bonds were of no value; that he, the register, thereupon advised Rouse to prove his debt as an unsecured debt, and told him, at the same time, that, by so proving his claim as an unsecured debt, he would, according to the law as held in the Northern district of New York, thereby relinquish his security on the bonds; that thereupon Rouse proved his debt as an unsecured debt; and that he, the register, understood that Rouse thereby intended to relinquish all claim upon the bonds as security. Rouse confirms this testimony of Mr. Gott, and says that he concluded to prove his debt as an unsecured debt, understanding that the effect of so proving it would be to surrender all claim upon the bonds; that he sent the bonds to Mr. McMahon without any instructions in regard to them, supposing that he had authority to ask for them, and was the proper person to send them to, and not considering them of any value; that he supposed the object of his examination on the reference was to establish the validity and honesty of his claim as a general creditor of Leland Brothers, and did not understand that it was to establish a claim for a preference over other creditors; that he never knew that any such claim was to be made in his behalf, and never authorized it; that he never intended to employ Mr. McMahon to act on his behalf to secure any preference for his debt, or to act for him in any way as his counsel; and that he did not know that Mr. McMahon claimed to be acting as counsel for him, until the bill for counsel fees was sent, which he declined to pay on the ground that he had never employed Mr. McMahon. On cross-examination, Rouse testifies that Mr. Gott did not inform him, nor did he know or think, that proving his debt as a secured debt would in any manner, or in any event, injure him or prejudice his claim; and that he had no other reason for proving his debt as an unsecured debt, than that he and Mr.

Gott thought the bonds as of no pecuniary value. After Rouse had so testified, Mr. McMahon was examined. He says, that when Rouse came to New York, and before he was examined on the 6th of December, 1872, he, McMahon, read over to Rouse a series of questions which he had put to witnesses who held secured mortgage bonds, relative to his intent to gain a preference (being substantially the same questions before referred to which were put to him on his direct examination), and asked him whether he could answer them truthfully, and he said he could. He also says: "I complained to Mr. Rouse about his sending me his six bonds, and putting me to the expense of $4.50. He said to me, 'Why, you can collect the bonds, and pay yourself out of it, and for your trouble also.' I told him the trustees had no money belonging to the estate in their hands, and, in case nothing was collected, I saw no fund out of which I was to be paid for my services. He said he had been beat out of a good deal of money, but he had a just and honest claim, and he was held for what I did for him. Within ten minutes after, we commenced the examination, and I acted as his counsel during the whole of that examination." After this Rouse was re-examined, and testifies that he did not at any time promise to pay Mr. McMahon for his services as his counsel, and did not ever employ him as counsel.

Irrespective of the proof of debt made by Rouse on the 1st of January, 1872, it is impossible to hold, on the foregoing evidence, that Rouse did not, at least, allow the trustees and their counsel to present and prosecute, on his behalf, his claim, on the bonds, to share in the fund, as a holder of the bonds, and do so consciously, and give testimony to aid such claim. His testimony that he owns and holds the bonds is wholly inconsistent with his having surrendered them. His testimony that the amount for which he holds them is $6,000 and interest, is wholly inconsistent with his having surrendered all claim on them. He had not given them up physically to the assignee. The questions as to a preferential intent, read over to him beforehand, and put to him on the examination, and answered, could—in view of his having testified that he still held and owned the bonds which he had taken, and that that he still held them for $6,000 dollars and interest —mean nothing else, to a rational mind, than that he was aiding in an attempt to maintain the validity of unsurrendered bonds, as against an allegation that they were invalid because preferential. His testimony clearly shows that, in proving his debt, without saying anything in the proof about the bonds, he had no idea or information that, if he named the bonds in the proof as security, he could suffer prejudice as to his debt; and that his only reason for saying nothing, in the proof, about the bonds, was, that he regarded them as of no pecuniary value. He

had no idea of surrendering something that was of pecuniary value, and that was worth retaining if not preferential. When he came to the reference, it is manifest he regarded the bonds as likely to have pecuniary value, and therefore he proceeded to attempt to sustain, instead of surrendering, them, and to attempt to make out that they were not preferential.

Rouse now claims that the proof of debt he filed was per se a surrender, made understandingly and advisedly, and that he could not, if he would, afterwards withdraw the proof and claim as a secured creditor. When he came to the reference, if the proof of debt had been brought up by the assignee as an estoppel against the assertion of a claim on the bonds by Rouse, Rouse might very well have applied to the court for leave to prove the debt as one secured by the bonds, or to withdraw the proof as made, on the ground that the debt had inadvertently been proved as an unsecured claim, in the belief and on the assurance that the bonds were of no pecuniary value, even if valid bonds, and that that was a mistaken belief, and that the bonds, if valid, were likely to be of pecuniary value, and that he wished to maintain the bonds as valid. His case, on the very evidence now presented, would have been a proper one for the granting of such application. As between himself and the assignee, he has substantially had that application made and granted, for the purpose of allowing him to attempt to maintain the validity of the bonds as against an objection that they were void as preferential. The assignee waived the objection which he might have taken, arising out of the proof of debt, and Rouse has had the benefit of attempting to maintain the bonds. He stood, in such attempt, as if he never had filed any proof of debt. He must take the risk with the benefit. Having attempted to maintain the bonds, notwithstanding the proof of debt, and having failed because the bonds were preferential, he must incur the consequences which the statute visits on such attempt and failure, and cannot now set up the proof of debt as doing away with such consequences.

The case of Rouse, therefore, is brought within the principles laid down as to the other cases. He cannot be allowed to prove the two acceptances, the proof under re-examination should be diminished by rejecting such acceptances, and the prayer of his petition must be denied.

[NOTE. After this decision a re-examination of the debt of A. T. Stewart was ordered. The case was heard, in addition to the other papers, upon the new proof taken in the re-examination. Case No. 8,231. An appeal upon the point involved, as to these debts sought to be proved, was taken to the circuit court, which affirmed the decision of this court. Case No. 8,235. The bankrupts' discharge is considered in Case No. 8,232; the right of another creditor to prove his claim in Case No. 8,233. The action of the assignee in bringing suits against the fraudulently preferred creditors is sustained in Case No. 11,220.]