## KEPPEL v. TIFFIN SAVINGS BANK. ·

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE
SIXTH CIRCUIT.

No. 116. Argued January 6, 1905.—Decided April 3, 1905.

The word "surrender," as generally defined, may denote either compelled
or voluntary action. In § 57g of the Bankruptcy Act of 1898, providing
that the claims of creditors who have received preferences shall not be
allowed unless such creditors shall surrender their preferences, it is
unqualified and generic and hence embraces both meanings.

A penalty is not to be readily implied and a person subjected thereto unless
the words of the statute plainly impose it, and courts will not construe
the provision so as to cause the word "surrender," as used in § 57g of
the Bankruptcy Act, to embrace only voluntary action and thus read
into the statute a qualification conflicting with equality of creditors and
also creating a penalty not expressly or by implication found in the
statute. Such a construction would create a penalty by judicial action
alone and would also necessitate judicial legislation in order to define
the character and degree of compulsion essential to prevent the surren-
der in fact from being a surrender within the meaning of the section.

The creditor of a bankrupt, who has received a merely voidable preference,
and who has in good faith retained such preference until deprived thereof
by the judgment of a court upon a suit of the trustee, can thereafter
prove the debt so voidably preferred.

CHARLES A. GOETZ became a voluntary bankrupt on Octo-
ber 12, 1900. George B. Keppel, the trustee, sued the Tiffin
Savings Bank in an Ohio court to cancel two real estate mort-
gages executed by Goetz, one to secure a note for four and
the other a note for two thousand dollars. The mortgage to
secure the four thousand-dollar note was made more than
four months before the adjudication in bankruptcy. The
mortgage securing the two thousand-dollar note was executed
a few days before the bankruptcy, the mortgagor being at the
time insolvent and intending to prefer the bank. The bank
defended the suit, averring its good faith and asserting the
validity of both the securities. In a cross petition the en-
forcement of both mortgages was prayed. The court held

the mortgage securing the four thousand-dollar note to be valid and the mortgage securing the two thousand-dollar note to be void. The trustee appealed to a Circuit Court, where a trial *de novo* was had. At such trial the attorney for the bank stated to the court that the bank waived any claim to a preference as to the two thousand-dollar note, but that he could not assent to a judgment to that effect. A judgment was entered sustaining the security for the four thousand-dollar note and avoiding that for the two thousand-dollar note.

The bank subsequently sought to prove that it was a creditor of the estate upon the note for two thousand dollars, and upon two other unsecured notes, aggregating $835. The referee refused to allow the proof, upon the ground that, as the bank had compelled the trustee to sue to cancel the security and a judgment nullifying it had been obtained, the bank had lost the right to prove any claim against the estate. The District Judge, upon review, reversed this ruling. The Circuit Court of Appeals to which the issue was taken, after stating the case as above recited, certified questions for our determination.

*Mr. John C. Royer*, with whom *Mr. Henry J. Weller* was on the brief for Keppel, trustee:

For definition of "surrender" see Century Dictionary and Bouvier's Dictionary. Congress intended a voluntary surrender. See act of 1867, § 23, 14 Stat. 517; Amendment of 1874, 18 Stat. 178. See cases in which the surrender clause of the act of 1867, prior to its amendment, was construed. *Re Lee*, No. 8179 Fed. Cases; *S. C.*, 14 N. B. R. 89; *Re Richter*, No. 11,803 Fed. Cases; *S. C.*, 1 Dill. 544; *Re Leland*, No. 8230 Fed. Cases; *S. C.*, 7 Ben. 156; *Re Stephens*, No. 13,365 Fed. Cases; *S. C.*, 3 Biss. 137; *Re Drummond*, 4049 Fed. Cases; *S. C.*, 4 Biss. 149; *Re Graves*, 9 Fed. Rep. 816.

While some of the judges allowed a surrender pending litigation, no creditor has been allowed to surrender his preference after judgment against him. See cases under the present act. *Re Owings*, 109 Fed. Rep. 624; *Re Keller*, 109 Fed. Rep. 162; *Re Greth*, 112 Fed. Rep. 978, follow the decisions under the

former law. *Re Richard*, distinguished, the facts being different. The rule may be harsh but these cases show that Congress intended the rule to be harsh.

*Mr. George E. Seney, Mr. Milton Sayler* and *Mr. John L. Lott* for the Tiffin Savings Bank:

The mortgage having been given by Goetz while insolvent, and within four months of the filing of his petition in bankruptcy, by operation of law alone became absolutely void, and the bank had no preference whatever. Under the law of Ohio the title and possession both remain in the mortgagor until condition broken. *Ely* v. *McGuire*, 2 Ohio St. 372; *Bradfield* v. *Hale*, 67 Ohio St. 316, 323; *Harkrader* v. *Leiby*, 4 Ohio St. 602, 612; *Sun Fire Office* v. *Clark*, 53 Ohio St. 414, 424; *Kernohan* v. *Mauss*, 53 Ohio St. 118, 133.

As to Federal decisions, there is a contrariety of opinion as to what constitutes a preference and as to when it shall be surrendered in order to entitle the person holding it to prove his claims. Most of the cases cited by opposing counsel arose under the act of 1867, and were cases in which there had been an actual payment of money, or the actual receipt or possession of property, or where the person had been a party to an actual fraud, and cannot be held controlling here. For cases bearing on the preference clause under the present law see notes in 1 Fed. Stat. Ann., pp. 664, 665, and see *Pirie* v. *Trust Co.*, 182 U. S. 438, as to whether a payment of money was a transfer of property within the meaning of the law. There was an actual payment and delivery—a completed transaction—a passing of property. *Bank* v. *Massey*, 192 U. S. 138.

The referee held that the bank had not made a voluntary surrender of its so-called preference, and therefore was not entitled to prove its claim. By so holding the referee read into the act something that is not there. The language of the act is surrender, not voluntary surrender. If a referee may inject into the act the word voluntary, it would be but a step further to require that a willing, a cheerful or even a joyful

surrender be made. Webster defines surrender as the giving or delivering possession of anything upon compulsion or demand, and the same definition is to be found in the Standard and Century dictionaries. If the ruling of the referee be correct, then a creditor who, in good faith, has accepted a payment or security, without knowledge of the insolvency of his debtor, must blindly surrender that. which he has received, without an opportunity for a determination of the question of insolvency at the time of the receiving of the payment or security, or of the question whether that which he has received constitutes a preference. The creditor is not required to submit to the ruling of the referee, but is entitled to the decision of the court upon the point. Section 57*f*.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The following are the questions asked by the Court of Appeals:

"First. Can a creditor of a bankrupt, who has received a merely voidable preference, and who has in good faith retained such preference until deprived thereof by the judgment of a court upon a suit of the trustee, thereafter prove the debt so voidably preferred?

"Second. Upon the issue as to the allowance of the bank's claims was it competent, in explanation of the judgment of the Ohio Circuit Court in favor of the trustee and against the bank in respect to its $2,000 mortgage, to show the disclaimer made in open court by the attorney, representing the bank, of any claim of preference, and the grounds upon which the bank declined to consent to a judgment in favor of the trustee?

"Third. If the failure to 'voluntarily' surrender the mortgage given to secure the $2,000 note operates to prevent the allowance of that note, does the penalty extend to and require the disallowance of both the other claims?"

Before we develop the legal principles essential to the solu-

tion of the first question it is to be observed that the facts
stated in the certificate and implied by the question show that
the bank acted in good faith when it accepted the mortgage
and when it subsequently insisted that the trustee should
prove the existence of the facts which, it was charged, vitiated
the security. It results that the voidable nature of the trans-
action alone arose from section 67e of the act of 1898, in-
validating "conveyances, transfers, or encumbrances of his
property made by a debtor at any time within four months
prior to the filing of the petition against him, and while insol-
vent, which are held null and void as against the creditors of
such debtor by the laws of the State, Territory or District in
which such property is situate," and giving the assignee a
right to reclaim and recover the property for the creditors of
the bankrupt estate.

On the one hand it is insisted that a creditor who has not
surrendered a preference until compelled to do so by the decree
of a court cannot be allowed to prove any claim against the
estate. On the other hand, it is urged that no such penalty
is imposed by the bankrupt act, and hence the creditor, on an
extinguishment of a preference, by whatever means, may
prove his claims. These contentions must be determined by
the text, originally considered, of section 57g of the bank-
rupt act, providing that "the claims of creditors who have
received preferences shall not be allowed unless such creditors
shall surrender their preferences." We say by the text in
question, because there is nowhere any prohibition against
the proof of a claim by a creditor who has had a preference,
where the preference has disappeared as the result of a decree
adjudging the preferences to be void, unless that result arises
from the provision in question. We say also from the text as
originally considered, because, although there are some de-
cisions under the act of 1898 of lower Federal courts, which
are referred to in the margin,[1] denying the right of a creditor

---

[1] *In re Greth,* 112 Fed. Rep. 978; *In re Keller,* 109 Fed. Rep. 118, 127;
*In re Owings,* 109 Fed. Rep. 623.

to prove his claim, after the surrender of a preference by the compulsion of a decree or judgment, such decision rests not upon an analysis of the text of the act of 1898 alone considered, but upon what were deemed to have been analogous provisions of the act of 1867 and decisions thereunder. We omit, therefore, further reference to these decisions as we shall hereafter come to consider the text of the present act by the light thrown upon it by the act of 1867 and the judicial interpretation which was given to that act.

The text is, that preferred creditors shall not prove their claims unless they surrender their preferences. Let us first consider the meaning of this provision, guided by the cardinal rule which requires that it should, if possible, be given a meaning in accord with the general purpose which the statute was intended to accomplish.

We think it clear that the fundamental purpose of the provision in question was to secure an equality of distribution of the assets of a bankrupt estate. This must be the case, since, if a creditor, having a preference, retained the preference, and at the same time proved his debt and participated in the distribution of the estate, an advantage would be secured not contemplated by the law. Equality of distribution being the purpose intended to be effected by the provision, to interpret it as forbidding a creditor from proving his claim after a surrender of his preference, because such surrender was not voluntary, would frustrate the object of the provision, since it would give the bankrupt estate the benefit of the surrender or cancellation of the preference, and yet deprive the creditor of any right to participate, thus creating an inequality. But it is said, although this be true, as the statute is plain, its terms cannot be disregarded by allowing that to be done which it expressly forbids. This rests upon the assumption that the word "surrender" necessarily implies only voluntary actions, and hence excludes the right to prove where the surrender is the result of a recovery compelled by judgment or decree.

The word "surrender," however, does not exclude compelled action, but to the contrary generally implies such action. That this is the primary and commonly accepted meaning of the word is shown by the dictionaries. Thus, the Standard Dictionary defines its meaning as follows: 1. To yield possession of to another upon compulsion or demand, or under pressure of a superior force; give up, especially to an enemy in warfare; as to *surrender* an army or a fort. And in Webster's International Dictionary the word is primarily defined in the same way. The word, of course, also sometimes denotes voluntary action. In the statute, however, it is unqualified, and generic, and hence embraces both meanings. The construction, which would exclude the primary meaning so as to cause the word only to embrace voluntary action would read into the statute a qualification, and this in order to cause the provision to be in conflict with the purpose which it was intended to accomplish, equality among creditors. But the construction would do more. It would exclude the natural meaning of the word used in the statute in order to create a penalty, although nowhere expressly or even by clear implication found in the statute. This would disregard the elementary rule that a penalty is not to be readily implied, and on the contrary that a person or corporation is not to be subjected to a penalty unless the words of the statute plainly impose it. *Tiffany* v. *National Bank of Missouri*, 18 Wall. 409, 410. If it had been contemplated that the word "surrender" should entail upon every creditor the loss of power to prove his claims if he submitted his right to retain an asserted preference to the courts for decision, such purpose could have found ready expression by qualifying the word "surrender" so as to plainly convey such meaning. Indeed, the construction which would read in the qualification would not only create a penalty alone by judicial action, but would necessitate judicial legislation in order to define what character and degree of compulsion was essential to prevent the surrender in fact from being a surrender within the meaning of the section.

It is argued, however, that courts of bankruptcy are guided by equitable considerations, and should not permit a creditor who has retained a fraudulent preference until compelled by a court to surrender it, to prove his debt and thus suffer no other. loss than the. costs of litigation. The fallacy lies in assuming that courts have power to inflict penalties, although the law has not imposed them. Moreover, if the statute be interpreted, as it is insisted it should be, there would be no distinction between honest- and fraudulent creditors, and therefore every creditor who in good faith had acquired an advantage which the law did not permit him to retain would be subjected to the forfeiture simply because he had presumed to submit his legal rights to a court for determination. And this accentuates the error in the construction, since the elementary principle is that courts are created to pass upon the rights of parties, and that it is the privilege of the citizen to submit his claims to the judicial tribunals, especially in the absence of malice and when acting with probable cause, without subjecting himself to penalties of an extraordinary character. The violation of this rule, which would arise from the construction, is well illustrated by this case. Here, as we have seen, it is found that the bank acted in good faith without knowledge of the insolvency of its. debtor and of wrongful intent on his part, and yet it is asserted that the right to prove its lawful claims against the bankrupt estate was forfeited simply because of the. election to put the trustee to proof in a court of the existence of the facts made essential by the law to an invalidation of the preference.

We are of opinion that, originally considered, the surrender clause of the statute was intended simply to prevent a creditor from creating inequality in the distribution of the assets of the estate by retaining a preference and at the same time collecting dividends from the estate by the proof of his claim against it, and consequently that whenever the preference has been abandoned or yielded up, and thereby the danger of inequality has been prevented, such creditor is entitled to stand

on an equal footing with other creditors and prove his claims.

Is the contention well founded that this meaning, which we deduce from the text of the surrender clause of the present act, is so in conflict with the rule generally applied in bankruptcy acts, and is especially so contrary to the act of 1867 and the construction given to it, that such meaning cannot be considered to have been contemplated by Congress in adopting the present act, and hence a contrary interpretation should be applied?

Without attempting to review the English bankruptcy acts or the provisions contained therein concerning what constituted provable debts, and the decisions relating thereto, it is clear that under those acts, where a debt was otherwise provable and the creditor had acquired a lien to which he was not entitled, the English courts in bankruptcy did not imply a forfeiture by refusing to allow proof of the debt because there had not been a voluntary surrender of the preference. On the contrary, where claims were filed against the estate by one who was asserted to have retained a preference, a well-settled practice grew up, enforced from equitable considerations. The practice in question was followed in the case of *Ex parte Dobson*, 4 Deacon & Chitty English Bankruptcy Reports, 69, decided in 1834, and was thus stated in the opinion of Sir G. Rose (p. 78):

"I apprehend the practice to be settled, where a creditor applies to prove a debt, and claims a right to property to which the Commissioners think he has no lien, that the Commissioners admit the proof, and leave the question to be controlled merely by retention of the dividend. This was settled by the case of *Ex parte Ackroyd* [1 Rose, 391], where the Commissioners had rejected the proof of a creditor, because he had received a portion of his debt, which the assignees contended he was bound to refund; but when the question came before Sir John Leach, as Vice Chancellor, he decided that the proof of the debt was not to be rejected, because there was a question

to be tried between the bankrupt's assignees and the creditor, although it was proper that no dividend should be paid on that proof, until the question was determined."

And Erskine, C. J., p. 78, after assuming that the transaction complained of might have been fraudulent and amounted to an act of bankruptcy, said—italics mine—(p. 75):

"The next part of the prayer is, that the claim should be disallowed. *But though the assignment of the property may be invalid, that will not invalidate the debt of the respondents.* We could not therefore disallow the claim, or expunge the proof, if the claim had been converted into a proof; all that we can do is, to restrain the respondents from receiving any dividends, until they give up the property."

Thus the English rule substantially conformed to the construction we have given to the bankruptcy act before us.

Neither our bankrupt act of 1800, 2. Stat. 19, nor that of 1841, 5 Stat. 440, contained a surrender clause or any provision generally denying the right of a creditor of a bankrupt to prove his debt in the event that he had received a preference. But, under those acts, bankruptcy courts must necessarily have exercised the power of protecting the estate by preventing a creditor having an otherwise provable debt who retained that which belonged to the estate from at the same time taking dividends from it.

The purpose of Congress when a forfeiture or penalty was intended not to leave it to arise from mere construction, but to expressly impose such penalty or forfeiture, is well illustrated by the bankrupt act of 1800, wherein numerous penalties and forfeitures were explicitly declared. Two instances are illustrative. By section 16 it was provided: "That if any person or persons shall fraudulently, or collusively claim any debts, or claim or detain any real or personal estate of the bankrupt, every such person shall forfeit double the value thereof, to and for the use of the creditors." And by section 28 it was provided that a creditor suing out a commission, who subsequently accepted a preference, "shall forfeit and lose, as well

his or her whole debts, as the whole he or she shall have taken and received, and shall pay back, or deliver up the same, or the full value thereof, to the assignee or assignees who shall be appointed or chosen under such commission, in manner aforesaid, in trust for, and to be divided among the other creditors of the said bankrupt, in proportion to their respective debts."

The bankrupt act of 1867, c. 176, 14 Stat. 517, 528, contained the following surrender clause:

"SEC. 23. . . . Any person who, after the approval of this act shall have accepted any preference, having reasonable cause to believe that the same was made or given by the debtor, contrary to any provision of this act, shall not prove the debt or claim on account of which the preference was made or given, nor shall he receive any dividend therefrom until he shall first have surrendered to the assignee all property, money, benefit, or advantage received by him under such preference."

And section 35 of the act conferred power upon the assignee to sue to set aside and recover illegal preferences, transfers, etc., but there was not contained in the section any provision prohibiting the proof of claims after recovery by the assignee. In section 39 of the act, however, which was found under the head of involuntary bankruptcy, there was contained an enumeration of the various acts which would constitute acts of bankruptcy, and following a grant of authority to the assignees to sue for and recover property transferred, etc., by the bankrupt contrary to the act, the section concluded with the declaration that when the recipient had reasonable cause to believe that a fraud on the act was intended, and that the debtor was insolvent, "such creditor shall not be allowed to prove his debt in bankruptcy."

Passing the present consideration of the judicial construction given to the act of 1867, and treating, as we believe should be done, the restriction as to the proof of debts expressed in section 39 as applicable to voluntary as well as involuntary bankruptcy, we think, as a matter of original interpretation, the surrender clause of the act of 1867 not only fortifies but ab-

solutely sustains the construction which we have given to the surrender clause of the act of 1898. Whilst the surrender clause of the act of 1867 changed the method of procedure prevailing under the English rule, and presumptively also obtaining under the acts of 1800 and 1841, by which a creditor holding a preference might prove his claim but was allowed to obtain no advantage from so doing until he had surrendered his preference, it cannot we think in reason be considered that this mere alteration in the practice to be followed was intended in and of itself to impose a penalty upon a creditor who did not voluntarily surrender his preference. And this we think is demonstrated when it is seen that after making the change as to the procedure in the proof of debts by preferred creditors there was subsequently embodied in section 39 an express prohibition, in the nature of a penalty, forbidding the proof of debt by a creditor who came within the purview of the section. Either that provision solely related to proof of debts embraced in the previous surrender clause or it did not. If it did, then the expression of the penalty in section 39 indicates that it was not deemed that the surrender clause contained provision for the penalty, otherwise section 39 would in that regard be wholly superfluous. If, on the other hand, it be considered that section 39 embraced other debts or claims against the estate than those to which the surrender clause related, then the expression of the penalty in section 39, under the rule of *expressio unius*, could not by implication be read into the previous surrender clause. That is to say, if section 23 and section 39 of the act of 1867 be considered as not in *pari materia*, then it follows that the former, the surrender clause, standing alone, did not impose the penalty or forfeiture provided for in the latter. If they were *in pari materia*, then the penalty, whilst applicable and controlling as to both, because of its expression in the later section, cannot be said to have existed alone in and by virtue of an earlier section, wherein no penalty was expressed.

The decisions of the lower Federal courts interpreting the

sections in question, as they stood prior to the amendment of section 39 of the act of 1874, hereafter to be referred to, were numerous, and we shall not attempt to review them in detail. They will be found collected in a note contained in the eleventh edition of Bump on Bankruptcy, pp. 550 *et seq.* Disregarding the discord of opinion shown by those decisions concerning what constituted an involuntary surrender—that is, whether it was involuntary if made at any time after suit brought by the assignee, or was only so after recovery by the force of a judgment or decree—and putting out of view also the differences of opinion which were engendered by the fact that the forfeiture imposed by section 39 was found in that portion of the act of 1867 which related to involuntary bankruptcy, we think the decisions under the act of 1867, prior to the amendment of 1874, may be classified under four headings.

First. The cases which held that the prohibition of section 39 against the proof of debt operated as a bar to such proof, even although there was a voluntary surrender, where the preference had the characteristics pointed out in section 39. These cases were, however, contrary to the great weight of authority under the act, and the construction which they enforced may be put out of view.

Second. Those cases which, whilst treating the surrender clause as giving a creditor an alternative which he might exercise without risk of penalty or forfeiture, yet held that by the operation of section 39 upon the surrender clause the creditor lost the option to prove his claim, when the surrender was compelled by a judgment or decree at the suit of the assignee. The cases enforcing this interpretation constituted the weight of authority, and such construction may, therefore, be said to have been that generally accepted, and, in our judgment, was the correct one.

These cases, which thus held that the loss of the right to prove, after compulsory surrender, arose not from the surrender clause independently considered, but solely from the operation upon that clause of section 39, are exemplified by

the case of *In re Leland,* 7 Ben. 156, opinion of Blatchford, J. In that case, after holding (p. 162) that the prohibition of section 39 applied as well to cases of voluntary as to cases of involuntary bankruptcy, the court came to consider the surrender clause of section 23 as affected by the penalty provided for in section 39, and said:

"This provision is to be construed in connection, and in harmony, with the provision of the twenty-third section, before cited. If, under the twenty-third section, the preferred creditor were allowed to surrender to the assignee the property received in preference, even after it had been recovered back by the assignee, as mentioned in the thirty-ninth section, so as to be able to prove his debt, no creditor taking a preference would ever be debarred from proving his debt. If, under the thirty-ninth section, it were held that the mere taking of a preference by a creditor would debar him from proving his debt, without the precedent necessity for a recovery back by the assignee of the property conveyed in preference, there never could be any scope for the operation of the twenty-third section in respect to a surrender."

Thus clearly pointing out that by the surrender clause alone the creditor would not be debarred from proving his claim if in fact there had been a surrender, whether voluntary or not, but that as a result solely of the prohibition of section 39 the creditor would be barred after recovery by the assignee.

Third. Cases which treated the surrender clause as in and of itself forbidding a surrender after recovery, because the recovery authorized by section 35 was the antithesis of the surrender and precluded a surrender after recovery. This class of cases in effect treated the prohibition expressed in section 39 as unnecessary, *quoad* the subject matters to which sections 23 and 35 were addressed. The cases, however, were few in number, and are illustrated by the case of *In re Tonkin,* 4 N. B. R. 52.

Fourth. Cases which without seemingly considering the incongruity of the reasoning adopted both theories; treated

sections 23, 35 and 39 as *in pari materia*, and hence applied
the prohibition of section 39 to the other two sections, and yet
reasoned to show that the surrender clause alone prohibited
a surrender after recovery by the assignee. This class of cases
is illustrated by *In re Richter*, 1 Dill. 544; 4 N. B. R. 221. In
that case a creditor, who, in consequence of a recovery by the
assignee, had surrendered a preference, sought to prove his
claim against the estate, and his right to do so was resisted.
Analyzing the act and stating the different constructions of
which it was susceptible, the court expressly declared that the
correct view was to construe sections 23, 35 and 39 together,
and that the result of so doing would be to annex to both
sections 35 and 23 the penalty provided in section 39. The
surrender clause was then noticed, it being said:

"It is urged by the claimants that this refusal was erroneous
because they had, before the time when they made their mo-
tion, surrendered to the assignee all property received by them
under the preference. This devolves upon us the duty of
interpreting the meaning of the word *surrender*, as it is here
used. And it is our opinion, that a creditor who receives
goods by way of fraudulent preference, and who refuses the
demand therefor which the assignee is authorized to make
(section 15), denies his liability, allows suit to be commenced
by the assignee, defends it, goes to trial, is defeated and judg-
ment passes against him, which he satisfies on execution,
cannot be said within the meaning of the statute, to have
surrendered to the assignee the property received by him under
such preference. He has surrendered nothing."

As an alternative, however, to this view, and treating the
sections referred to as *in pari materia*, it was reiterated that
section 23 was limited and controlled by the penalty provided
in section 39.

We need not further notice the cases under the act of 1867,
because of the action of Congress on the subject. In 1874,
18 Stat. 178, section 39 of the act of 1867 was amended and
reënacted. That amendment consisted of omitting the for-

feiture clause as originally contained in the section and substituting in its stead the following proviso:

"*Provided,* . . . and such person, if a creditor, shall not, in cases of actual fraud on his part, be allowed to prove for more than a moiety of his debt; and this limitation on the proof of debts shall apply to cases of voluntary as well as involuntary bankruptcy."

Plainly, this amendment not only abolished the penalty provided in section 39 as originally enacted, since it allowed a creditor to prove his claim for the whole amount thereof after recovery against him if he had not been guilty of actual fraud, and even in case of actual fraud after recovery permitted him to prove for a moiety. The amendment clearly also was repugnant to that construction of the act of 1867 given in some of the cases to which we have referred under the third classification, wherein in the reasoning employed it was assumed that a forfeiture or penalty might be implied alone from the terms of the surrender clause, irrespective of the operation of section 39. This results from the very words of the amendment, which says, and this *limitation on the proof of debts* shall apply, etc., showing that the restriction on the right to prove after a compulsory yielding up of a preference was deemed by Congress to result, not from the surrender clause, but from the limitation expressly declared by section 39 as amended, which operated a qualification of the broad terms of the surrender clause. It manifestly also arises from the fact that whilst Congress plainly intended by the amendment to make a change in the rigor of the rule previously obtaining, the phraseology of the surrender clause as originally found in the act was not altered.

After the adoption of the amendment of 1874 it is true that in one or two instances it was held that the amendment, instead of mitigating the severity of section 39 as it stood before the amendment, had increased it by adding an additional limitation, viz., prohibiting a preferred creditor who had been guilty of actual fraud from proving for more than one-half of his claim, even where he had voluntarily surrendered his

preference. But these were isolated cases, since practically the otherwise universal construction was that the amendment was remedial and intended by Congress to mitigate, even in cases of actual fraud, the severity of the prohibition of section 39 as originally enacted.

The import of the amendment was tersely stated by Mr. Justice Clifford in *In re Reed*, 3 Fed. Rep. 798, 800, as follows:

"Beyond doubt the question must depend upon the true construction of the act of Congress, and I am of opinion that Congress intended to moderate the rigor of the prior rules and to allow the creditors, after payment back of the preference, whether by suit or otherwise, to prove their whole debt, in case they had been guilty of no actual fraud."

And such construction was also expounded in the following cases: *In re Currier* (1875), 2 Lowell, 436; *Burr* v. *Hopkins*, (1875) 6 Biss. 345, per Drummond, J.; *In re Black* (1878), 17 N. B. R. 399, per Lowell, J.; *In re Newcomer* (1878), 18 N. B. R. 85, per Blodgett, J.; *In re Kaufman* (1879), 19 N. B. R. 283, per Nixon, D. J.; *In re Cadwell* (1883), 17 Fed. Rep. 693, per Coxe, J.

The meaning of the amendment of 1874 was considered by the Court of Appeals of New York in the case of *Jefferson County National Bank* v. *Streeter*, 106 N. Y. 186. The New York court expressly adopted the construction given in the cases to which reference has just been made, and its action in so doing was affirmed by this court in *Streeter* v. *Jefferson County Bank*, 147 U. S. 36.

It follows that the construction which we at the outset gave to the text of the act of 1898, instead of being weakened, is absolutely sustained by a consideration of the act of 1867, both before and after the amendment of 1874, and the decisions construing the same, since in the present act, as we have said, there is nowhere found any provision imposing even the modified penalty which was expressed in the amendment of 1874. The contention that because the act of 1898 contains a surrender clause, therefore it must be assumed that

Congress intended to inflict the penalty originally imposed by section 39 of the act of 1867 must rest upon the erroneous assumption that that penalty was the result of the surrender clause alone. But this, as we have seen, is a misconception, since from the great weight of judicial authority under the act of 1867, as well as by the express enactment of Congress in the amendment of 1874 and the decisions which construed that amendment, it necessarily results that the penalty enforced under the act of 1867 arose not, from the surrender clause standing alone, but solely from the operation upon that clause of the express prohibition contained in section 39 of that act. When, therefore, Congress in adopting the present act omitted to reënact the provision of the act of 1867, from which alone the penalty or forfeiture arose, it cannot in reason be said that the omission to impose the penalty gives rise to the implication that it was the intention of Congress to reënact it. In other words, it cannot be declared that a penalty is to be enforced because the statute does not impose it.

And, irrespective of this irresistible implication, a general consideration of the present act persuasively points out the purpose contemplated by Congress in refraining from reënacting the penalty contained in section 39 of the act of 1867. Undoubtedly the preference clauses of the present act, differing in that respect from the act of 1867, as is well illustrated by the facts of this case, include preferences where the creditor receiving the same acted without knowledge of any wrongful intent on the part of the debtor and in the utmost good faith. *Pirie* v. *Chicago Title & Trust Co.*, 182 U S. 438, 454. Having thus broadened the preference clauses so as to make them include acts never before declared by Congress to be illegal, it may well be presumed that Congress, when it enacted the surrender clause in the present act, could not have contemplated that that clause should be construed as inflicting a penalty upon creditors coming within the scope of the enlarged preference clauses of the act of 1898, thereby entailing an unjust and unprecedented result.

Our conclusion, therefore, is that the first question propounded must be answered in the affirmative, and that the two other questions require no response.

*And it is ordered accordingly.*

MR. JUSTICE DAY, with whom JUSTICES HARLAN, BREWER and BROWN concurred, dissenting.

I am unable to agree with the construction given to the sections of the bankruptcy act under consideration, and because of the importance of the questions involved have deemed proper a statement of the conclusions reached.

Notwithstanding the first question propounded by the Court of Appeals presupposes that the $2,000 mortgage was a preference within the meaning of the bankrupt act, it is argued on behalf of the creditors that although the mortgage, made a few days prior to the bankruptcy proceedings and when the bankrupt was insolvent, was void under section 6343 of the Revised Statutes of Ohio, as amended April 26, 1898, 93 Ohio Laws, p. 290, read in connection with section 67, paragraph *e*, of the bankruptcy act, it did not constitute a preference which must be surrendered, preliminary to proof of the creditor's claim, because there was no actual transfer of any property to the creditor, and the only thing obtained was a void mortgage.

The Ohio statute makes provision, among other things, as to sales, etc., in trust or otherwise, in contemplation of insolvency, or with a design to prefer one or more creditors to the exclusion, in whole or in part, of others, and sets forth:

"And every such sale, conveyance, transfer, mortgage or assignment made, . . . by any debtor or debtors, in the event of a deed of assignment being filed within ninety (90) days after the giving or doing of such thing or act, shall be conclusively deemed and held to be fraudulent, and shall be held to be void as to the assignee of such debtor or debtors, whereupon proof shown, such debtor or debtors was or were actually insolvent at the time of the giving or doing of such act

or thing, whether he or they had knowledge of such insolvency or not.  . . ."

By section 67, paragraph *e*, of the bankrupt act, it is provided:

"And all conveyances, transfers, or encumbrances of his property made by a debtor at any time within four months prior to the filing of the petition against him, and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the State, Territory, or District in which such property is situate, shall be deemed null and void under this act against the creditors of such debtor if he be adjudged a bankrupt, and such property shall pass to the assignee and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt."

Under section 60 of the bankruptcy act of 1898 it was provided:

"*a.* A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class.

"*b.* If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

In section 1, paragraph 25, of the act of 1898, a "transfer" is defined to include the sale and every other and different mode of disposing of or parting with the property or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift or security.

This definition of a transfer covers a mortgage given for the

security of a debt in express terms, and section 60 provides that preferences shall include transfers, the effect of the enforcement of which would be to enable any one of the bankrupt's creditors to obtain a greater percentage of his debt than other creditors of the same class.

It is true that if the mortgage is void, it can have no effect to diminish the estate of the bankrupt, but upon its face the mortgage is good as against the bankrupt and the creditors of the estate.

It is said that the mortgage being void, the creditor had nothing to surrender, but this assumes the invalidity of the security. Until set aside or voluntarily surrendered it is a good encumbrance upon the property, whether regarded as a conditional conveyance or as a mere security for the debt. It could be set aside by the trustee upon proof of insolvency of the bankrupt and other conditions named in the act at the time of giving it; otherwise it would stand as a valid security, unless the creditor should elect to surrender it and make proof of his claim as a general creditor.

There seems to be no question that, upon its face, though void in the light of the facts found, this mortgage was one of the transfers of property which was invalidated by the act, it being given within the time limited, and at a time when the bankrupt was in fact insolvent, and expressly made void by the Ohio statute when read with the bankrupt act of 1898.

The answer to the first question requires a consideration of paragraph 57g of the act of 1898, which, as it stood prior to the amendment of February 5, 1903, read: "The claims of creditors, who have received preferences shall not be allowed unless such creditors shall surrender their preferences." May a creditor who has received a preference, voidable by the act, contest the validity thereof, and if it is declared invalid, still prove his debt upon surrender of his preference as though no contest had been had?

It was held by this court in *Pirie* v. *Chicago Title & Trust Company*, 182 U. S. 438, that a creditor who had received a

preference, although he did not have reason to believe that one was intended, could only keep the property transferred upon condition of refraining from proof of the balance of his debt.

It was pointed out in that case, in the opinion of the court by Mr. Justice McKenna, that section 60 in its various provisions permitted a creditor, who had innocently received a preference, to hold it if he chose, and it could only be recovered by the trustee in the event that he had reasonable cause to believe that a preference was intended, in which case the trustee might recover the property or its value. But the innocent creditor might keep the property transferred to him, although a preference within the definition of the act, upon terms of non-participation in the bankruptcy estate in the general distribution to the creditors.

Section 23 of the bankruptcy act of 1867 provided: "   .   .   . Any person who, after the approval of this act shall have accepted any preference, having reasonable cause to believe that the same was made or given by the debtor, contrary to any provision of this act, shall not prove the debt or claim on account of which the preference was made or given, nor shall he receive any dividend therefrom until he shall first have surrendered to the assignee all property, money, benefit or advantage received by him under such preference." Section 57*g* of the present act, prior to the amendment of February 5, 1903, required broadly that claims of creditors who have received preferences shall be surrendered, and that the same shall not be allowed unless this is done.

Under the former act the surrender was required of creditors who had accepted preferences, having reasonable cause to believe the same contrary to the provisions of the act, and such creditor could not receive any dividend until he had first surrendered the preference. In passing the act of 1898, Congress doubtless had before it prior legislation on the subject, and particularly the act of 1867, the most recent enactment on the subject.

Section 57*g* provides that all preferences, whether innocent

or otherwise, shall be surrendered before the creditor can prove his claim, and the right of proof is not postponed *until* the surrender, but claims are not to be allowed *unless* creditors shall surrender their preferences. The element of time is indicated in the word "until," which means to the time of, or up to, while the use of "unless" more emphatically denies the right of proving the claim, save or except upon terms of relinquishing the preference.

In view of the purpose of the bankruptcy act to make an equal distribution of the bankrupt's estate among creditors of the same class and to avoid preferences made within four months, I think, having in view the first question put by the Circuit Court of Appeals, that the sections of the law in question must be construed to put a creditor who has received a merely voidable preference, which could be recovered from him by the trustee, to his election between striving to retain that which he has received, and voluntarily surrendering his preference, and filing his claim that he may participate with other unsecured creditors in the general distribution of the estate.

The law looks to a prompt, equal and inexpensive distribution of the estate among those entitled thereto, and I do not think it was intended to permit a creditor to take the chances of litigation with the trustee, and when defeated still have the right to "surrender" his preference and participate in the distribution of the general estate. I think the surrender contemplated by the law is not the capitulation which comes after unsuccessful resistance, but is intended to require the creditor, who must be presumed to know the law, to make a prompt election and to stand or fall upon the choice made. In other words, it was not intended to permit a creditor who holds security liable to defeat under the law to keep it if he can maintain it by successful contest and, if not, to have the same right and privilege as to proof of his debt that he would have if he promptly availed himself of the privilege of surrender which the law gives to one who would place himself upon a general equality with other creditors of the estate.

These conclusions are sustained by a consideration of the terms of the law under discussion, as well as the adjudicated cases which have arisen under it. The act of 1898 made important changes when compared with the bankrupt law of 1867. As we have already seen, section 23 of the latter act limited the requirement as to the surrender of preferences to those made or given contrary to the provisions of the act. Section 35 of the same law gave the right to the assignee in bankruptcy to set aside illegal preferences, and section 39, after enumerating certain transactions which should amount to acts of bankruptcy, including fraudulent conveyances as therein described, provided that whenever the beneficiary had reasonable cause to believe that a fraud upon the act was intended, or the debtor was insolvent, the assignee might recover the property, and the creditor should not be allowed to prove his debt in bankruptcy. In 1874, 18 Stat. 178, section 39 of the act was amended, and, instead of prohibiting a creditor who had received a conveyance in fraud of the act from proving his debt, it was provided that such creditor should not, in case of actual fraud on his part, be allowed to prove for more than a moiety of his debt, and this limitation should apply to cases of voluntary as well as involuntary bankruptcy.

It will not, in my view, aid in the determination of the proper construction of the act of 1898 to review the numerous and conflicting decisions made under the act of 1867 as to the effect of these various provisions upon the right of the creditor to prove his claim. The great weight of authority is that one who had a voidable preference under the act could not be permitted to prove his claim after a judgment had been rendered against him in a contest with the trustee.

Presumably with the provisions of the act of 1867 before it, providing that in certain cases of fraudulent conveyance the creditor could not prove his claim in bankruptcy, first as to the whole, and later as to a half of the debt, and the limitations of the requirement to surrender preferences to those made in violation of the act, Congress laid aside these requirements,

and broadly provided in section 57*g* of the act of 1898 that all preferences · must be surrendered as a condition of proof of claims against the estate.   The innocent holder of a preference could not be·deprived of his right of election between proof of his debt and the surrender of·his preference.   He who had a voidable preference might surrender it and prove his debt. If he did not "surrender," the trustee could recover the preference, and the privilege of proof which was conditioned upon surrender no longer existed.

Prior ·to the amendment of 1903 this court, in the. case of *Pirie* v. *Trust Company*, already referred to, decided that the requirement extended to all manner of preferences, whether innocently received or otherwise, and this was the law until the amendment of 1903.

Therefore the sole question here is: What is meant by the term "surrender" as used in the act of 1898?

We have been referred to four cases decided under this law before the passage of the amendment of 1903.   Before passing to them I may refer to·a decision of Judge Dillon at the circuit; *In re Richter*, 1 Dill. 544, rendered in 1870 under the act of 1867, but in defining the word "surrender" and pointing out its meaning, the language of the learned judge is as pertinent now as it was then.   Having before him the construction of the term "surrender" as used in section 23 of the act of 1867, and speaking of the right of a creditor to prove the balance of a claim which had been illegally preferred, the judge said:

· "The statute is that they shall not prove up the debt or claim on account of which the preference was given.   It was this precisely which, by the motion under consideration, they sought to have done, and which the court refused to allow.

"It is urged by the claimants that this refusal was erroneous because they had, before the time when· they made their motion, surrendered to the assignee all property received by them under the preference.   This devolves upon us the duty of interpreting the meaning of the word *surrender*, as it is here used.   And it is· our opinion that a creditor, who receives

goods by way of fraudulent preference, and who refuses the demand therefor which the assignee is authorized to make (section 15), denies his liability, allows suit to be commenced by the assignee, defends it, goes to trial, is defeated and judgment passes against him, which he satisfies on execution, cannot be said within the meaning of the statute, to have surrendered to the assignee the property received by him under such preference.

"He has surrendered nothing. He accepted a fraudulent preference and defended it to the last. Paying a judgment which he stoutly resisted, and from which he could not escape, is not such a surrender as the statute contemplates. To hold that it was would be against the spirit of the statute, which is to discourage preferences. Such a holding would manifestly encourage them, for if the transaction should be upheld the creditor would profit, if overthrown, he would lose nothing, and stand upon an equal footing with those over whom he had attempted to secure an illegal advantage, and whom he has, by litigation, delayed in the collection of their claims."

The question, under the act of 1898, came before the United States District Court for the Northern District of Iowa, in the case of *In re Keller*, 109 Fed. Rep. 118; 6 Am. B. R. 334, where the subject is discussed by Judge Shiras. Summing up the matter, the learned judge said:

"It would certainly be wholly inequitable to hold that a creditor who has received a preference from an insolvent debtor can refuse to account therefor, and after causing the other creditors the delay, cost, and expense of litigation, after being defeated therein, can still prove up his claim, and take an equal share in the proceeds of the estate after depleting the same in the manner stated. Contesting the claim of the trustee, and paying back the preference in obedience to the process of the court, is not a surrender, within the meaning of clause '*g*' of section 57. Therefore there is this difference between a preferred creditor who surrenders the preference and a preferred creditor from whom the preference is recovered by the trustee:

The former, having voluntarily surrendered the preference received, is entitled to prove up his entire claim, and share with the other creditors. The latter, having refused to surrender, cannot prove the claim or share in the estate."

To the same effect is *In re Owings*, 109 Fed. Rep. 623, and in *In re Greth*, 112 Fed. Rep. 978; 7 Am. B. R. 598, the cases are reviewed and the same conclusion reached.

In Collier on Bankruptcy, third edition, section 319, that author says:

"The question what constitutes a surrender has received much discussion. It is admitted by all that if the assignee is compelled to bring an action to invalidate a transfer, and if he recovers and enters up a judgment, no subsequent payment of that judgment by the preferred creditor and no subsequent compliance by him with its terms can be considered a surrender. By his judgment the trustee has 'recovered' the property. In legal effect the transferee no longer has anything to surrender."

And in the fifth edition of the same work, p. 420, it is said:

"What is a surrender.—Here the doctrines declared under the law of 1867 seem at least somewhat applicable. The phrasing of that statute undoubtedly colored some of the decisions under it. But, under well-recognized principles of law, a surrender that is compulsory is not a surrender. The element of fraud is usually present, but may be lacking; the test is: was the act a voluntary one? Each case turns on its own facts and there is some conflict, but the weight of decision under the present law supports this view."

The only case, decided under the act of 1898, which has come to my attention sustaining a contrary view is *In re Richard*, 94 Fed. Rep. 633; 2 Am. B. R. 506, in which it was decided that, notwithstanding the preference was set aside, after a fruitless fight with the trustee, the creditor might prove his claim.

We are cited to *Streeter* v. *Jefferson County Bank*, 147 U. S. 36, as sustaining the contrary view of the meaning of the term

"surrender" as used in this act.   The case was under the act of 1867.   But in that case the contest was over a stock of goods, and the creditor, the bank, had consented through its attorneys to the appointment of a special receiver, who was ordered to sell the goods and pay the proceeds into court.   Of this feature of the case Mr. Justice Shiras, who delivered the opinion of the court, said (p. 45):

"To sustain the contention that the bank did not surrender its preference, it is urged that the bank did not at once, on demand of the assignee, turn over the goods levied on, but litigated the matter with the assignee in both the District and the Circuit Courts, and that the proceeds of the executions were not relinquished until final judgment was entered against the bank.

"It was the opinion of the state court that, as the sheriff, having custody of the goods seized on execution was, with the consent of the bank's attorneys, appointed special receiver, and was ordered to sell the goods and pay the proceeds into court, to await the result of the litigation between the bank and the assignee in bankruptcy, and that as the proceeds were finally turned over to the assignee, and thus became subject to distribution as bankruptcy assets, the transaction amounted to a surrender under section 5084.   In so holding we think the state court was right."

We are also cited to the meaning of the word "surrender" as given in the Standard Dictionary:

"1. To yield possession of to another upon compulsion or demand, or under pressure of a superior force; give up, especially to an enemy in warfare; as to *surrender* an army or a fort."

This definition is given in support of the contention that a surrender may sometimes be made involuntarily.   This is doubtless true, and obviously the term may have different meanings when used in different connections.   It may be that an army may surrender a fort after a most vigorous contest, while there is still the choice between further resistance and

yielding the fortress to an enemy, but the most liberal meaning of the term could hardly describe as a surrender the occupation which a victorious army has gained of a fort after it has ejected the enemy from its walls and is securely intrenched therein without leave of those who have been forcibly driven out.

The bankrupt law contemplates that a secured creditor, who holds a security voidable under the law and which he should put into the common fund as a condition of the right to participate with other unsecured creditors in the division of the estate, must make his choice while he has yet something to give for the privilege of being taken from the class of those who have a security which may be taken from them, and placed in a class, always favored in the bankrupt law, who shall share in the equal distribution of the bankrupt's estate, freed from fraudulent conveyances and voidable preferences.

The complete answer to the argument that one who has received a preference which he must give up before proof as a general creditor has the right to try out with the trustee the question of the validity of the preference and then surrender, is that when the judgment of the law has taken the preference from him he has nothing left to surrender, and if then so disposed the creditor cannot surrender a thing which has been wrested from him by the strong hand of the law.

In this case the Ohio statutes, when read with the bankrupt law, distinctly avoid preferences, and the trustee, by bringing the action, diminished the estate and delayed its distribution. The creditor, before the litigation, had his election as to the course he would pursue. While he had something to surrender he might give it up, prevent costs, delay and litigation, and aid the speedy and equal distribution of the bankrupt's estate. After two judgments against him, and when he had absolutely nothing to give up to the bankrupt's estate, it is, in our view, too late to "surrender."

I think the construction here given comports with the purposes and carries into effect the design of the act as expressed

by its terms. It is true that in the present case, after resisting the attack upon the $2,000 mortgage in the Court of Common Pleas, and when the judgment had gone against the bank it did not appeal, and its counsel in the Circuit Court disclaimed intention to insist upon the preference of the $2,000 mortgage, but even then refused consent to a decree against the mortgage, and in our opinion the time of election was before judgment in the court of original jurisdiction wherein the mortgage was contested and defeated. It is unnecessary to consider whether an election to surrender the preference can be made after issued joined and before judgment. In this case a trial was had upon the merits. The judgment rendered was vacated by the appeal and in the appellate court, notwithstanding the qualified disclaimer of counsel for the bank, a final judgment was rendered against the mortgage.

These considerations lead to the conclusion that the first and second questions should be answered in the negative.

The importance of the ruling just made is shown in its application not only to the act of 1898 as it originally stood, but to the act as it now stands since the amendment of February 5, 1903, which only requires a surrender of preferences when the same are in violation of subdivision *b* of section 60, or void or voidable under § 67, subdivision *e*. The reasoning of the majority of the court permits the holder of a preference, no matter how fraudulent, to contest with the trustee when his preference is attacked, and when convicted of fraud and an intention to defeat the purposes of the law to "surrender" that which the law has declared he cannot hold, and prove his debt as a general creditor. To permit this seems to me to defeat the purpose of the act and to encourage the very thing the surrender clause was intended to promote—a prompt and inexpensive distribution of the estate. The fraudulent transferee, although he has lost his suit, has taken no risk, and may still prove his claim on an equality with unpreferred creditors over whom he has sought an illegal advantage. I cannot agree

with this construction, and therefore dissent from the judg-
ment and reasoning of the majority of the court.

I am permitted to state that MR. JUSTICE HARLAN, MR.
JUSTICE BREWER, and MR. JUSTICE BROWN concur in this
dissent.