In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3324

Michael F. Connor and Jane H. Connor,

Petitioners-Appellants,

v.

Commissioner of Internal Revenue,

Respondent-Appellee.

Appeal from the United States Tax Court.
No. 3552-98--John J. Pajak, Judge.

Argued March 29, 2000--Decided July 5, 2000

Before Flaum, Ripple and Kanne, Circuit Judges.

Kanne, Circuit Judge.  Michael and Jane Connor appeal a tax court decision finding a deficiency of $3,616 in their 1993 federal income tax and $6,089 in their 1994 federal income tax. This finding of deficiency arose from the determination that Michael Connor actively managed his personal services C corporation, which rents an office building owned by Jane Connor, and for this reason, the passive activity loss rules barred the offset of income from the rental against other passive losses. The Connors claim on appeal that in 1993 and 1994 the "material participation" requirement of the passive activity rules did not apply to shareholders in C corporations and that the lease was exempted from passive activity rules under a "written binding contract" exception. Because we find that in 1993 and 1994, the "material participation" test applied to shareholders in non-pass-through entities and that the lease between the C corporation and Jane Connor was not binding, we affirm the decision of the tax court.

I.  History

Michael Connor is a dentist. He owns a majority of the shares in his personal services C corporation, Connor & McKeever, S.C. ("corporation"), which was known in 1993 as Michael F. Connor, D.D.S., S.C., and works full-time for the corporation. The corporation leases

from Jane Connor, Michael Connor's wife, the office building in which Michael Connor practices. The Connors file a joint tax return.

The lease on Michael Connor's office commenced in October 1979. According to the original document, the lease was to run until October 1982, and thereafter to continue year to year under the same terms and conditions. However, in October 1982, the Connors signed an addendum to the lease, which provided that "[t]his lease will continue in force between [the Corporation] and Jane H. Connor 'Lessor' until either party terminates such with ninety days written notice. Rental increases can only be made upon agreement of both parties." Both parties continue to abide by the terms of the lease up to the present, but the rent has increased from $900 per month in 1979 to $2,000 per month in 1994.

In 1993, the Connors reported $10,503 in net income from the lease of the office. The Connors characterized this income as passive and used it to set off certain passive losses from the rental of a second property. In 1994, the Connors reported $15,937 in net income from the lease of the office. They characterized this income as passive and again used it to set off passive losses from the rental of other property.

In 1997, the Commissioner of Internal Revenue ("Commissioner") issued a notice of deficiency to the Connors, informing them that the Commissioner had determined that the rental of the dental office to be a non-passive activity. For this reason, the Commissioner believed that the Connors should not have offset their gains from this activity against losses from their other passive activities. The Commissioner assessed a deficiency of $3,616 for 1993 and $6,089 for 1994 as a result of the Connors' mischaracterization and also sought a penalty of $723 for 1993 and $1,218 for 1994 for negligence, pursuant to Internal Revenue Code (I.R.C.) sec. 6662(a).

The Connors contested this notice of deficiency in tax court. They claimed that because the Corporation, rather than Michael Connor, leased the dental property, the rental was a passive activity for the Connors. In support of this position, they maintained that the 1993-1994 regulations applying the passive activity rules provided that shareholders in C corporations did not materially participate in the activities of these corporations. The tax court disagreed, holding that although Connor was only a shareholder in the Corporation, he materially participated in the lease, and for that reason, the lease income was non-passive income for the Connors. On this basis, the tax court affirmed

the deficiency claimed by the Commissioner but declined to penalize the Connors for negligence.

II.  Analysis

On appeal, the Connors contest the determination of the tax court on two grounds. First, they argue that the tax court erred in concluding that the passive activity regulations then in effect deemed C corporation shareholders as materially participating in the activities of those corporations. We review de novo conclusions of law reached by the tax court. See L & C Springs Assocs. v. Commissioner, 188 F.3d 866, 869 (7th Cir. 1999). Second, the Connors argue that the "written binding contract" exception applies to their lease, exempting the income generated by the lease from the passive activity rules. For this reason, the Connors claim that the tax court erred as a matter of law in finding them in deficiency. We review de novo this question of law. See Pittman v. Commissioner, 100 F.3d 1308, 1312 (7th Cir. 1996).

A.  1993-94 Passive Activity Regulations

The Connors contend that during 1993-94, the I.R.C. regulations in force allow them to use the income generated from the lease between Jane Connor and the corporation to offset certain investment losses generated by other passive investments in real estate held by Michael Connor. The I.R.C. regulations in force prior to 1993 allowed the Connors to perform this income offset, but the regulations issued in 1993 failed to reenact the exemption that allowed the Connors to do so, and in 1994, the regulations promulgated by the Secretary of the Treasury ended the Connors' ability to offset this income by characterizing the rental income from the lease as "non-passive" in contrast with the "passive" income generated by the Connors' other investment activities. Thus, the Connors ask us to interpret the I.R.C. regulations governing passive activity income attribution in effect in 1993-1994 to determine whether income generated by a lease like that made by the Connors should be considered passive or non-passive, a determination which depends on whether a taxpayer like Michael Connor can be said to "materially participate" in the activities of his corporation.

As part of the Tax Reform Act of 1986, enacted at 26 U.S.C. sec. 1 et seq., Congress limited the financial incentive for many taxpayers to structure traditional tax shelters. Pursuant to this legislative purpose, the passive activity rules, enacted as I.R.C. sec. 469, disallow the deductibility of certain losses generated by "passive activities," except insofar as to offset

the gains from other passive activities. See I.R.C. sec. 469(a). Section 469(c) defines a passive activity as "any activity--(A) which involves the conduct of any trade or business, and (B) in which the taxpayer does not materially participate." I.R.C. sec. 469(c)(1)(A)-(B).

Code section 469(h) defines "material participation" in an activity as involvement that is regular, continuous and substantial. See I.R.C. sec. 469(h)(1)(A)-(C). To supplement this provision, however, Congress also authorized the Secretary of the Treasury to promulgate regulations "which specify what constitutes an activity, material participation, or active participation for the purposes of this section." I.R.C. sec. 469(l)(1).

Rental activities are expressly included as passive activities, but if a taxpayer participates materially in an entity involved in the rental of property, the proceeds from that rental may be deemed to arise from a non-passive activity. See I.R.C. sec. 469(c)(2); Treas. Reg. sec. 1.469-4. Passive activity rules apply to personal services corporations, see I.R.C. sec. 469(a)(2)(C), and for purposes of determining whether a taxpayer materially participates in an activity, participation of his spouse will be included as participation of the taxpayer. See I.R.C. sec. 469(h)(5); Treas. Reg. sec. 1.469-5T (f)(3); see also Fransen v. United States, 191 F.3d 599, 601 (5th Cir. 1999). On this basis, the parties agree that if the regulations setting out the passive activity rules deem Michael Connor to have participated materially in the activities of his personal services corporation, the income from the rental of his dental office would be characterized as non-passive.

The instant dispute centers on the regulations issued by the Secretary to explain when a taxpayer participates materially in an entity to which he leases property, a scenario in which "self-rental income" is generated. Prior to 1992, the temporary regulations promulgated by the Secretary to apply the passive activity rules ("temporary regulations") provided that shareholders in non-pass-through entities, such as the corporation, did not participate materially in the activities of such entity, making self-rental income from a lease to a C corporation passive in nature. See Temp. Treas. Reg. sec. 1-469-4T(b)(2)(ii)(B) (1989). For pass-through entities, the temporary regulations applied a seven-part test to determine whether the owners participated materially in the entity's activities. See Temp. Treas. Reg. sec. 1.469-5T(a) (1989). If a taxpayer was determined to have participated materially in an entity to

which he rented, the resulting self-rental income was non-passive income and could not be offset against other passive losses. Because of the exemption for non-pass-through entities, Michael Connor did not participate materially in the rental activity of his personal services corporation before 1993, and during this period, the parties agree that the income from the rental was appropriately characterized as passive income.

Effective for all tax years beginning May 11, 1992, however, the Secretary replaced the temporary regulations with a new set of proposed regulations. See PS-01-89, 57 Fed. Reg. 20802 (1992). Rather than explicitly excluding the shareholders in non-pass-through entities, the proposed regulations applied a broader, "facts-and-circumstances" test to all entities to determine whether the activities of an entity and an owner of the entity should be considered a single activity. See Prop. Treas. Reg. sec. 1.469-4(c)(2) (1992). This facts-and-circumstances test applied to self-rental income, which continued to be considered a non-passive activity if the taxpayer participated materially in the entity to which he rented. See Prop. Treas. Reg. sec. 1-469-2(f)(6) (1992). In addition, the Secretary re-promulgated the seven-part test for material participation, see Prop. Treas. Reg. sec. 1-469-5T(a) (1992), but the proposed regulations did not expressly address the material participation of shareholders in non-pass-through entities.

In 1994, the Secretary issued final regulations applying I.R.C. sec. 469. The final regulations generally maintained the same standards as the proposed regulations. The final regulations retained the seven-part material participation test and the rule that self-rental income was to be considered non-passive when a taxpayer materially participated in the entity to which he rented. However, the final regulations added language clarifying that the seven-part material participation test would be applied to shareholders in non-pass-through entities to which sec. 469 applied-- closely-held C corporations and personal services corporations-- as well as to pass-through entities. See Treas. Reg. sec. 1.469-4(a) (1994) ("A taxpayer's activities include those conducted through C corporations that are subject to section 469, S corporations, and partnerships."). The final regulations were to apply retroactively to all tax years ending after May 10, 1992, see Treas. Reg. sec. 1-469-11 (a)(1), but the final regulations allowed taxpayers to apply either the proposed regulations or the final regulations to the 1993 and 1994 tax years. See Treas. Reg. sec.

1.469-11 (b)(2).

The Connors admit that under the final regulations, the seven-part test for material participation applies to determine whether Michael Connor materially participates in the activities of the Corporation and that, under this test, Michael Connor materially participates in the Corporation. Because Jane Connor's activities are merged with his to determine whether income arises from a passive activity, the parties agree that, under the final regulations, the self-rental income from the lease to the Corporation has correctly been characterized as non-passive in nature.

The Connors contend that, because of the change of treatment of C corporation shareholders between the temporary regulations and the final regulations, the material participation test of the proposed regulations cannot be interpreted to apply to shareholders in non-pass-through entities. On this basis, they claim that during 1993-1994, Michael Connor did not participate materially in the activities of the Corporation. Unlike both the temporary regulations and the final regulations, the proposed regulations do not address expressly whether shareholders in non-pass-through entities materially participate in the activities of these entities. The Connors ask us to interpret this ambiguity in the proposed regulations consistently with the temporary regulations because it would be unfair to construe the proposed regulations adversely to taxpayers given the reversal in treatment of shareholders in non-pass-through entities that occurred between the promulgation of the temporary regulations and the promulgation of the final regulations. In support of this interpretation, the Connors cite numerous statements made by treasury officials when the proposed regulations were promulgated that allegedly indicate a desire to retain the same treatment. However, we reject this interpretation.

Instead, we uphold the IRS's interpretation of the proposed regulations to deem C corporation shareholders as materially participating in the activities of these entities. The IRS has interpreted the proposed regulations to require the tax court to use a "facts-and-circumstances" analysis on all entities to determine whether the material participation standard is appropriate, rather than retaining the C corporation exception included in the temporary regulations. We grant great deference to the IRS's interpretation of its regulation and will uphold this interpretation "unless it is plainly erroneous or inconsistent with the regulation." Stinson v.

United States, 508 U.S. 36, 45 (1993); see also Parsons v. Pitzer, 149 F.3d 734, 738 (7th Cir. 1998). The interpretation of the proposed regulations endorsed by the IRS accords with the purpose of the passive activity loss regulations, which is to assess accurately whether a taxpayer is involved in the active management of a trade or business in such a fashion that passive activity treatment would be inaccurate. See, e.g., Temp. Reg. sec. 1.469, background, 53 Fed. Reg. 5686, 5686-87 (1988).

The history of the material participation test also favors the IRS's interpretation of the proposed regulations. When the regulations setting out the passive activity rules were promulgated initially, shareholders in non-pass-through entities were explicitly excepted from the material participation test. See Temp. Treas. Reg. sec. 1-469-4T(b)(2)(ii)(B) (1989). However, in response to criticism about the "mechanical" nature of the temporary regulations, the Secretary allowed many of the passive activity regulations to expire and failed to re-enact many provisions, including the exception at issue here. Courts generally refuse to construe a failure to re-enact a portion of a statute as indicative of a desire to retain the rule set forth in that portion. See, e.g., Keppel v. Tiffin Savings Bank, 197 U.S. 356, 373 (1905); In re UNR Indus., Inc., 736 F.2d 1136, 1139 (7th Cir. 1984). The traditional rule of statutory or regulatory construction holds instead that failure to re-enact a statutory provision deems that provision repealed by implication. See 1A Norman J. Singer, Sutherland Statutory Construction, sec. 23.28, at 413 (6th ed. 1988). On this basis, tax courts have twice interpreted the proposed regulations to deviate in intent and structure from the previously effective temporary regulations. See Sidell v. Commissioner, 78 T.C.M. 99-1929 (1999) ("[T]he Secretary did not intend in those proposed regulations to adhere to the position previously taken in the temporary regulations."); Schwalbach v. Commissioner, 111 T.C. 215, 228 (1998) (concluding that "nothing in the [proposed regulations] that would lead [the court] to believe that the Commissioner was proposing to retain the rule" exempting shareholders in non-pass-through entities).

Instead of retaining a mechanical test to judge a taxpayer's activities, including a mechanical exception for shareholders in non-pass-through entities, on promulgation of the proposed regulations, the Secretary shifted to a broader "facts and circumstances" analysis of these activities. This shift in analytical style implies a repeal of all the mechanical tests previously used to compute whether a taxpayer

participated materially in a given activity, except those tests that were expressly re-enacted by the Secretary, such as the seven-part material participation test. For this reason, the natural interpretation of a failure to renew the protection of shareholders like the Connors is not an implied retention of the per se rule that these shareholders cannot participate materially.

We believe that the natural interpretation of the failure to renew expressly this regulation is that taxpayers should be placed on notice that the Secretary expanded the existing standard for material participation in an activity, to which all taxpayers would now be subject. As such, by enacting the proposed regulations, the Secretary repealed by implication any per se exclusion of shareholders in non-pass-through entities and deemed that these taxpayers participate materially in the activities of the entities in which they possess an ownership interest when they meet the seven-part test previously applicable only to taxpayers in pass-through entities. On this basis, we believe that the proposed regulations contemplate the inclusion of shareholders in non-pass-through entities within the seven-part test for material participation in an entity's activities. Because Connor admits that his activities constitute material participation under this test, we find that he participated materially in the activities of the Corporation in 1993-1994, and for this reason, the income generated from the rental of his office space to the corporation would be non-passive in nature.

B.  Written Binding Contract Exception

The Connors also contend that the income generated by the lease between Jane Connor and the corporation may be characterized as passive because the parties first entered into the lease in 1979. The final passive activity regulations include a provision allowing taxpayers to characterize leases as passive when these leases were made by "written binding contract" prior to February 19, 1988. See Treas. Reg. sec. 1.469-11(c)(1)(ii).

The government contends that because both parties retain the right to terminate the lease unilaterally on ninety-days notice, the lease is not a written binding contract within the meaning of sec. 1.469-11(c)(1)(ii), even though the lease between the corporation and Jane Connor was initially entered into in 1979 and amended in 1982. The government argues that the purpose of the exemption is to protect certain long-term leases that were entered into prior to the

promulgation of the regulations because of the cost to taxpayers of restructuring these leases to avoid adverse tax consequences. Because both parties reserve the right to terminate the lease, the government contends that neither party is "bound" by the contract, and the taxpayers do not require the protection of the exemption to restructure the terms of the lease.

The temporary regulations included an explanatory provision, which defined a contract as written and binding "if and only if the contract is enforceable against such person under the applicable State law and does not limit damages to a specified amount (e.g., by use of a liquidated damages provision). . . . In general, a contract is binding upon a person even if it is subject to a condition, as long as the condition is not within the control of such person." Temp. Treas. Reg. sec. 1.469-11T(c)(7) (1989). However, because this definition was included within the transition rules applying the passive activity regulations, this definition was not re-promulgated when the Secretary issued the proposed or final regulations. For this reason, although informative as to the intent of the drafters of the exemption, we will not be compelled to accept this interpretation of the "written binding contract" requirement if we determine that this interpretation violates the purpose and plain language of the exemption. The government also cites other instances in which the Secretary has promulgated regulations requiring a written binding contract in which the term has been interpreted in the same manner, See Temp. Treas. Reg. sec. 1.168(j)-1T; see also Bell Atlantic Corp. v. United States, No. 96-8657, 1998 WL 848122, at *3-4 (E.D. Pa. 1998) (interpreting written binding contract requirement of sec. 203(b) of Tax Reform Act of 1986 using the same definition, also provided in the applicable transitional rules). However, these other transitional rules, albeit similar, provide little new insight into the interpretation of the term "written binding contract" in this regulation, and we focus instead on interpreting the plain language of sec. 1.469-11T(c)(7).

No other court has had the occasion to interpret sec. 1.469-11T(c)(7), and when resolving a dispute over the meaning of a statute, we look to the statute itself to determine whether the statute is plain and unambiguous with regard to the dispute. See United States v. RonPair Enterprises, Inc., 489 U.S. 235, 241 (1989); Matter of Voelker, 42 F.3d 1050, 1051 (7th Cir. 1994). In this case, the language of the transitional rule appears unambiguous. To qualify for exemption from

passive activity characterization, a lease must be in writing and it must be binding. At a minimum, for a lease to be binding on a party, it must be enforceable under applicable state law. Because the lease involves Wisconsin property, we must first apply Wisconsin law to determine if the lease binds the parties.

Wisconsin's statute on rental agreements requires that for a lease with a duration of more than one year to be enforceable, it must meet the state Statute of Frauds, Wis. Stat. sec. 706.02, and also set forth "the amount of rent or other consideration, the time of commencement and expiration of the lease and a reasonably definite description of the premises." Wis. Stat. sec. 704.03(1). Wisconsin law allows parties to a lease the option to extend their lease, in which case, no new lease is required. See Nelson v. Nelson, 169 N.W. 278, 279 (Wis. 1918). Instead, the extended lease is treated as "a continuance of the original [lease] for a further time upon compliance with the conditions for [the option's] exercise." Seefeldt v. Keske, 111 N.W.2d 574, 575 (Wis. 1961). However, the amount of rent and the premises to be leased are essential terms to the contract, and essential terms to a lease cannot be modified without meeting the Statute of Frauds. See Borkin v. Alexander, 132 N.W.2d 587, 590 (Wis. 1965).

The original lease between the parties stated a specific date of commencement and expiration, a term of greater than one year and a specific amount of rent. As such, this lease met both the requirements of the Statute of Frauds and the additional requirements of sec. 704.03(1). Therefore, the original lease was binding on the parties under Wisconsin law. However, this lease would have expired by its own terms on October 31, 1982, so on that date, the parties signed an "addendum" to the lease, which amended the lease to allow it to continue in force "until either party terminates such with written notice of 90 days" and to allow rental increases with the agreement of both parties.

The Connors contend that the original lease granted the parties to the lease an option to renew the lease. By signing the addendum, they argue that they exercised this option to renew with the additional terms of the addendum constituting amendments to the original lease, which continued in force. Because they merely renewed a binding lease, they argue that the lease continued to be binding as long as the parties agreed not to terminate it, up to and including the period of 1993-94.

The original lease provided for a term of three

years, and thereafter allowed the lease to continue "from year to year under the same terms and conditions." We agree that this provision within the lease bestows on the parties the option to renew the lease, and we accept the Connors' position that the addendum to the lease constitutes an exercise of this option. However, the addendum included two amendments to the lease that changed its essential terms. First, the addendum provided that the lease would continue in force until terminated by either party with ninety-days written notice. Second, the addendum adds the provision that the parties may increase the rent amount on agreement of both parties.

These amendments render the lease unenforceable under Wisconsin law. Section 704.03 requires for a lease to be "enforceable" that the lease must set forth in writing "the amount of rent or other consideration," and "the time of commencement and expiration of the lease." Wis. Stat. sec. 704.03(1). The amount of rent due under the terms of the original lease was set at $10,800 per year, and the Connors contend that this original statement satisfies the requirement that the lease set forth the amount of rent. However the parties amended the lease to allow them to increase the rent, and this amendment made it possible for the parties to increase the rent to $22,000 per year in 1993 and $24,000 per year in 1994. Because these modifications were oral and not written and because the Wisconsin Statute of Frauds requires that increases in rent, like other modifications to essential terms of a contract, be made in writing, see Borkin, 132 N.W.2d at 590, these rental increases would not have been enforceable in 1993 or in 1994. As such, we hold that the amendment to the lease that allowed the parties to change the amount of rent cancelled the explicit written amount of rent required by sec. 704.03(1).

The addendum also changed the term of the lease from a fixed period of three years to an indefinite term to be determined by either party. For this reason, the lease, as amended, does not set forth in writing the time of expiration of the contract. The Connors argue that the definition of lease provided by statute allows for an indefinite point of termination; "a lease is for a definite period of time . . . if the commencement and expiration can be ascertained by reference to some event, such as the completion of a building." Wis. Stat. sec. 704.01(1). The Connors suggest that the event by which to reference the expiration of the lease is the written notice of termination given by a party, in which case the date of termination is specified in the lease. However, this interpretation of an "event" does not correspond

to the example of an "event" provided in the statute, the completion of a building. From the example provided in the statute, we infer sec. 704.01 to allow a lease to contain indefinite commencement or termination only when this termination lies beyond the direct control of the parties, as when the parties cannot occupy a building that has not been completed. The Connors' assertion, that any point at which a party wishes to terminate the lease is a definite "time of termination" renders the statutory requirement of a written date of termination meaningless. For this reason, by changing the term of the lease from a three-year period to an indefinite period corresponding to the intent of the parties, the parties failed to include the necessary terms in the contract required by sec. 704.03(1).

Because the parties changed essential terms of the lease by signing the addendum to the lease, they rendered the lease unenforceable under Wisconsin law. Had either party sought to challenge the terms of the lease, especially those terms that were orally modified pursuant to the addendum, that party would not have been bound by the terms of the lease. For this reason, we believe that by signing the addendum, the lease no longer remained enforceable or binding on the parties. The income generated by the lease should not be shielded from non-passive characterization by the "written binding contract" exception to the passive activity rules.

The Connors argue that they remained bound by the contract because they were required to provide ninety-days notice under the terms of the lease. However, this argument lacks merit. Under Wisconsin law, landlords must provide tenants with notice of termination of a lease before the lease expires, even if that lease is unenforceable. See Wis. Stat. sec.sec. 704.03(2), 704.19. If a lease is unenforceable--if it fails to meet the requirements of sec. 704.03(1)--the lease is treated as a periodic tenancy, with the period determined by the type of use of the leased premises. See sec. 704.03(2). If the premises are used for non-residential purposes, the lease is treated as a year-to-year tenancy, and the tenant must be provided with at least ninety-days notice. See id.; sec. 704.19(3). This ninety-day period required by statute corresponds exactly with the ninety-days notice required by the addendum to the lease. Therefore, under the terms of the addendum, the parties are "bound" to provide no more notice under the terms of the contract than would they be were there no written contract at all. To interpret the requirement that a written contract be "binding" under Treas.

Reg. sec. 1.469-11(c)(1)(ii) to include unenforceable common law contracts as well as all enforceable written leases, would eviscerate the word "binding" of all meaning, an interpretation we refuse to permit. See generally United States v. Szakacs, No. 98-3932 et al., 2000 WL 528069, at *8 (7th Cir. May 2, 2000) (refusing to interpret the term "another felony offense" in a manner that would render superfluous the word "another").

From the period 1979-1982, the lease between the Corporation and Jane Connor was a written binding contract. However, because the amendments to the lease rendered it unenforceable under Wisconsin law, from 1982, the lease no longer remained binding on the parties. For this reason, the lease was not a "written binding contract" as of 1988, and the Connors cannot rely on the "written binding contract" exception to the passive activity rules to shield the income generated by this lease from non-passive characterization.

III.  Conclusion

Because we find that, during the 1993-94 period, the proposed Treasury regulations governing attribution of passive activity income should be interpreted to allow shareholders in C corporations to participate materially in the activities of these corporations and because we find that the 1979 contract executed between the Corporation and Jane Connor was not binding on the parties in 1988, we Affirm the determination of the tax court.