T.C. Memo. 2012-23

UNITED STATES TAX COURT

L.A. AND RAYANI SAMARASINGHE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5082-09.                    Filed January 19, 2012.

<u>Matthew Pollick Cavitch</u>, for petitioners.

<u>Beth A. Nunnink</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and accuracy-related penalties
under section 6662(a)[1] for 2005 and 2007 as follows:

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
                                        (continued...)

|       |            | Penalty   |
|-------|------------|-----------|
| Year  | Deficiency | Sec. 6662 |
|       |            |           |
| 2005  | $18,068    | $3,614    |
| 2007  | 29,803     | 5,961     |

After concessions,[2] the issues for decision are: (1)
Whether rental income attributable to petitioners' rental of a
commercial office building they owned to a related professional
corporation in 2005 and 2007 was passive income under the
transition rule set forth in section 1.469-11(c)(1)(ii), Income
Tax Regs., as petitioners contend, or was nonpassive income under
the self-rental rule of section 1.469-2(f)(6), Income Tax Regs.,
as respondent determined; and (2) whether petitioners are liable
for accuracy-related penalties under section 6662(a). In order
to decide issue (1), we must decide whether a lease executed in
1980 between petitioners and petitioner husband's wholly owned
professional corporation constituted a written binding contract
within the meaning of section 1.469-11(c)(1)(ii), Income Tax
Regs., with respect to 2005 and 2007.

_____

[1](...continued)
Procedure. Monetary amounts have been rounded to the nearest
dollar.

[2]The parties stipulated that if the self-rental rule of sec.
1.469-2(f)(6), Income Tax Regs., is applicable, then petitioners
are liable for the deficiency. If the self-rental rule is not
applicable, then petitioners are not liable for the deficiency.
The parties also stipulated that the Westwood property "was
rented for use in a business activity in which petitioner-husband
materially participates."

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioners resided in New Jersey when they petitioned this Court.

Petitioners are husband and wife. Petitioner L.A. Samarasinghe (petitioner) graduated from medical school in 1967. After graduation petitioner began to practice medicine. During the years at issue, petitioner, who specializes in internal medicine and in critical care, was an employee of his wholly owned professional corporation, L.A. Samarasinghe, M.D., P.A. (medical corporation).

In the late 1970s petitioner hired Ramesh Sarva (Mr. Sarva), a certified public accountant (C.P.A.), to provide accounting services to the medical corporation and to petitioners. Over the years, Mr. Sarva, among other things, (1) helped petitioner incorporate his medical practice, (2) performed accounting and bookkeeping services for the corporation and for petitioners, (3) provided tax planning advice, including advice on tax shelters and real estate investments, and (4) prepared tax returns for the medical corporation and for petitioners.

At some point before or during 1979 Mr. Sarva advised petitioner to purchase real property for the medical corporation's use. Mr. Sarva also advised petitioner to purchase

the real property in his individual capacity rather than through the medical corporation.  In 1979 petitioners purchased an office building in Westwood, New Jersey (Westwood property), and titled the property in both their names.  The Westwood property is conveniently situated only a few blocks from Pascack Valley Hospital, which petitioner visits frequently in connection with his medical practice.

After petitioners purchased the Westwood property, Mr. Sarva prepared a lease using a standardized lease form that purported to lease the Westwood property to the medical corporation in exchange for monthly rent payments and other consideration.  The lease recited that the medical corporation would use the Westwood property as a doctor's office.  The lease ran from July 1, 1980, until June 30, 1981, with the term "to be renewed automatically unless sooner terminated as hereinafter provided, at the ANNUAL RENT of $30,000.00 with 5% increase every year all payable in equal monthly installments in advance on the first day of each and every calendar month".  The lease also provided as follows:

> NINETEENTH.--The Landlord has made no representations or promises in respect to said building or to the demised premises except those contained herein, and those, if any, contained in some written communication to the Tenant, signed by the Landlord.  This instrument may not be changed, modified, discharged or terminated orally.

Petitioners and the medical corporation executed the lease on June 30, 1980 (the 1980 lease).  From June 30, 1980, when

petitioners and the medical corporation executed the 1980 lease, through and including the years at issue, Mr. Sarva had no knowledge of the existence of any document that formally amended the 1980 lease or of any other written lease regarding the Westwood property.[3]

The medical corporation maintained its offices in the Westwood property through at least 2007. During its occupancy of the Westwood property the medical corporation made numerous improvements to the property, including basic renovations and the installation of an in-house radiology system and a laboratory. The medical corporation paid for all improvements, the aggregate cost of which Mr. Sarva estimated to be approximately $100,000.

The medical corporation used a fiscal year that began on December 1 and ended on November 30 for accounting and tax purposes. During the course of a fiscal year the medical corporation periodically issued checks to petitioner without designating what the checks were for. The checks typically ranged in amount from $1,000 to as much as $43,000 and were made payable to petitioner. The checks did not contain any notation regarding the purpose of the payments. The medical corporation

---

[3]Although Mr. Sarva testified that there were no documents amending or modifying the 1980 lease and that there was no other written lease involving the Westwood property, we decline to find these statements as facts because Mr. Sarva can testify only to what he knew through personal knowledge. Because petitioners did not appear at trial or testify, whatever information they might possess is not before us.

issued the checks to petitioner whenever petitioner needed or wanted money.

Petitioner's office periodically sent Mr. Sarva the bank statements and canceled checks for the medical corporation, and Mr. Sarva's office would summarize the data using a software program called QuickBooks. The checks made payable to petitioner as well as other checks issued by the medical corporation for petitioner's personal expenses such as mortgage, property taxes, and estimated tax payments were recorded in general ledger account 241, Due Officer. At the end of the fiscal year Mr. Sarva made adjusting entries which allocated the payments made to petitioner during the year to specific expense accounts, such as salary/payroll and rent. Mr. Sarva determined the amounts to be allocated to salary and to rent. In making the allocation to rent, Mr. Sarva did not consult the 1980 lease, and he assumed that the annual rental period coincided with the medical corporation's fiscal year. With respect to the fiscal years ending November 30, 2005 and 2007, Mr. Sarva did not calculate what the annual rent should be under the 1980 lease, assuming it was in effect for those years, nor did he determine the amount of the required monthly lease payment under the lease. The record contains no evidence that the medical corporation made monthly rent payments to petitioners during 2005 and 2007 as would have

been required by the 1980 lease, assuming that the lease was still in effect for those years.

Mr. Sarva prepared Federal income tax returns for the medical corporation for the fiscal years ending November 30, 2004 through 2009. At least some of those returns were filed electronically. The medical corporation claimed deductions for rental expenses attributable to the Westwood property[4] on those corporate tax returns as follows:

| FYE Nov. 30 | Rental expense deduction |
|---|---|
| 2004 | $100,000 |
| 2005 | 100,000 |
| 2006 | [1]133,319 |
| 2007 | [2]156,224 |
| 2008 | 38,621 |
| 2009 | 168,940 |

[1]The parties stipulated petitioners' retained copy of the medical corporation's 2006 Federal tax return. The retained copy shows a rental expense deduction of $139,989. The parties also stipulated a copy of the Tax Return Database electronic return information for the medical corporation's 2006 return. The electronic return information summary reflects that the medical corporation claimed a rental expense deduction of $133,319.

---

[4]The parties stipulated that the following amounts represent the correct amounts of rent required by the 1980 lease if it was still in effect for rental terms ending in 2004 through 2009:

| Rental term ending June 30 | Rental income |
|---|---|
| 2004 | $94,449 |
| 2005 | 99,172 |
| 2006 | 104,130 |
| 2007 | 109,337 |
| 2008 | 114,804 |
| 2009 | 120,554 |

²The parties stipulated petitioners' retained copy of the medical corporation's 2007 Federal tax return.  The retained copy shows a rental expense deduction of $133,828.  The parties also stipulated a copy of the Tax Return Database electronic return information for the medical corporation's 2007 return.  The electronic return information summary reflects that the medical corporation claimed a rental expense deduction of $156,224.

Petitioners timely filed their joint 2004 through 2009 Federal income tax returns, which Mr. Sarva also prepared. Petitioners reported the following rental income attributable to the Westwood property lease:

| Year | Rental income |
| --- | --- |
| 2004 | $100,000 |
| 2005 | 100,000 |
| 2006 | -0- |
| 2007 | 100,000 |
| 2008 | -0- |
| 2009 | 123,484 |

On Schedule E, Supplemental Income and Loss, of their 2005 and 2007 returns, petitioners treated the rental income of $100,000 as passive income, which was taken into account in calculating the passive losses for those years.

On December 3, 2008, respondent mailed petitioners a notice of deficiency for 2005 and 2007.  Respondent determined that the rental income attributable to the Westwood property constituted self-rental income, which is nonpassive income that cannot be taken into account in calculating the correct amount of a passive loss.  Respondent also determined that petitioners were liable for the 20-percent accuracy-related penalty under section 6662(a) for each of the years 2005 and 2007.

Petitioners timely petitioned this Court to redetermine respondent's determinations, and the case was set for trial on June 24, 2010.  Petitioners, who were represented by counsel, did not appear or testify at trial, and petitioners' counsel called only one witness, Mr. Sarva.

OPINION

## I.  Rental Payments as Nonpassive Income

### A.  Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer ordinarily bears the burden of proving that those determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a), however, provides that the burden of proof with respect to a disputed factual issue shifts to the Commissioner if the taxpayer produces credible evidence with respect to the issue, the taxpayer complied with the substantiation requirements, and the taxpayer cooperated with the Secretary[5] with regard to all reasonable requests for information.  Sec. 7491(a)(2); see also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).  Petitioners do not contend that section 7491(a) applies, and the

_____

[5]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i).

record does not permit us to conclude that petitioners satisfied the requirements of section 7491(a)(2).  Accordingly, petitioners bear the burden of proving that respondent erroneously determined that their 2005 and 2007 rental income attributable to the Westwood property was nonpassive income.

B.    Passive Activity Losses and the Self-Rental Rule

Generally, a taxpayer may deduct a loss incurred in a trade or business.  Sec. 165(c)(1).  However, a taxpayer may not deduct a loss from a passive activity.  Sec. 469(a).  Ordinarily, a passive activity is an activity involving the conduct of a trade or business in which the taxpayer does not materially participate.  Sec. 469(c)(1).  However, except as provided in section 469(c)(7), the term "passive activity" also includes a rental activity regardless of whether a taxpayer materially participates in the activity.  Sec. 469(c)(2), (4).

A passive activity loss is defined as the excess, if any, of the aggregate losses from passive activities during a taxable year over the aggregate income from passive activities for such year.  Sec. 469(d)(1).  In order to calculate a taxpayer's passive activity loss for a taxable year, the taxpayer must ascertain whether the taxpayer's income and losses are from

passive activities in accordance with rules set forth in section 469 and related regulations.[6]

Mr. Sarva characterized the rental income attributable to petitioners' rental of the Westwood property to the medical corporation during 2005 and 2007 as passive income and, in preparing petitioners' 2005 and 2007 returns, offset that income with passive losses to arrive at petitioners' nondeductible passive activity losses for 2005 and 2007. In the notice of deficiency, respondent recharacterized the rental income as nonpassive income, determining that the income was self-rental income within the meaning of section 1.469-2(f)(6), Income Tax Regs.

While section 469(c)(2) generally characterizes rental activity as passive, section 1.469-2(f)(6), Income Tax Regs., provides that net rental income received by the taxpayer for use of an item of the taxpayer's property in a business in which the taxpayer materially participates shall be treated as income not from a passive activity. The rule of section 1.469-2(f)(6), Income Tax Regs., which is sometimes referred to as the self-rental rule or the recharacterization rule, creates an exception to the normal rule set forth in section 469(c)(2) and (4) that

---

[6]Sec. 469(l)(2) authorizes the Secretary to promulgate regulations "which provide that certain items of gross income will not be taken into account in determining income or loss from any activity (and the treatment of expenses allocable to such income)".

income from a rental activity is passive income for purposes of section 469 regardless of whether a taxpayer materially participates in the activity. See Carlos v. Commissioner, 123 T.C. 275, 279-280 (2004).

The parties stipulated that petitioners rented the Westwood property to petitioner's medical corporation for use in the corporation's business. The parties also stipulated that petitioner materially participated in the business activity of the medical corporation. Because petitioner materially participated in the business activity and petitioners rented the property for such use, the self-rental rule would appear to apply. Therefore, unless an exception to the rule applies, petitioners must characterize the Westwood property rental income as nonpassive income and may not offset this income against accumulated and unused passive losses.

C.   Written Binding Contract Exception

Petitioners contend that the self-rental rule of section 1.469-2(f)(6), Income Tax Regs., does not apply because they are entitled to transitional relief under section 1.469-11(c)(1)(ii), Income Tax Regs. Section 1.469-11(c)(1)(ii), Income Tax Regs., provides that, in applying section 1.469-2(f)(6), Income Tax Regs., a taxpayer's rental income is passive if it is attributable to the rental of property "pursuant to a written binding contract entered into before February 19, 1988." To

qualify for transitional relief under the regulation, a taxpayer must prove that the rental income in question was paid pursuant to a written lease that was entered into before February 19, 1988, and was still in effect; i.e., was binding and enforceable for the year at issue. Krukowski v. Commissioner, 279 F.3d 547, 550 (7th Cir. 2002), affg. 114 T.C. 366 (2000). "At a minimum, for a lease to be binding on a party, it must be enforceable under applicable state law." Connor v. Commissioner, 218 F.3d 733, 740 (7th Cir. 2000), affg. T.C. Memo. 1999-185.

Petitioners executed a written lease with respect to the Westwood property--the 1980 lease. Because the parties do not dispute that the lease was entered into before February 19, 1988, and was in writing, the sole issue remaining is whether the 1980 lease remained in force and was binding under State law for 2005 and 2007. We examine relevant State law and the actions of the parties to the 1980 lease during the years at issue to decide this issue. The parties agree that the relevant State law is the law of the State of New Jersey.[7]

Under New Jersey law, an enforceable agreement exists when "two parties 'agree on essential terms and manifest an intention

[7]The 1980 lease did not specify the law governing the interpretation of the lease. In the absence of an agreement by the parties to a lease regarding applicable law, we apply the law of the State where the property is located. Krukowski v. Commissioner, 279 F.3d 547, 550 (7th Cir. 2002), affg. 114 T.C. 366 (2000); Connor v. Commissioner, 218 F.3d 733, 740 (7th Cir. 2000), affg. T.C. Memo. 1999-185.

to be bound by those terms.'" Barak v. Obioha, 74 Fed. Appx. 164, 166 (3d Cir. 2003). The essential terms of a lease include "an adequate description of the property, a definite term (including the commencement date), the agreed rental and the manner of payment." Brechman v. Adamar of N.J., Inc., 440 A.2d 480, 482 (N.J. Super. Ct. Ch. Div. 1981). If the lease term exceeds 3 years, the lease also must comply with the statute of frauds. N.J. Stat. Ann. 25:1-5 (West 1997).[8] Under the statute of frauds, the lease must be in writing and signed by both landlord and tenant. Id.

Unlike some other jurisdictions, New Jersey does not distinguish between a renewal and an extension of a lease. Schnakenberg v. Gibraltar Sav. & Loan Association, 117 A.2d 191, 195 (N.J. Super. Ct. App. Div. 1955); see also Balsham v. Koffler, 73 A.2d 272, 274 (N.J. Super. Ct. App. Div. 1950). If a lease provides for renewal, the renewal merely continues the old lease. Schnakenberg v. Gibraltar Sav. & Loan Association, supra at 195. A general covenant to renew "implies a renewal or extension for the same term as provided in the original lease, and is sufficiently definite and certain to be enforceable." Id.

---

[8]The parties do not dispute that the 1980 lease complied with the statute of frauds at the time of execution. Effective Jan. 5, 1996, New Jersey amended its statute of frauds, repealing N.J. Stat. Ann. 25:1-1 (1940). See P.L. 1995, c.360 (N.J. 1996). The parties agree that the statute of frauds in effect for 1980 applies to the 1980 lease.

No new lease is required.  <u>Jador Serv. Co. v. Werbel</u>, 53 A.2d 182, 185 (N.J. 1947).

The 1980 lease contained the essential terms required to make it a binding and enforceable agreement when it was executed in 1980.  The lease was in writing, contained an adequate legal description of the leased premises, and included provisions that specified the agreed term of the lease, the rent, and the manner in which the rent should be paid.  Its renewal and rent adjustment provisions, if followed by the parties to the lease, enabled the parties to renew the lease as a binding contract in years[9] after the initial rental term that ran from July 1, 1980, through June 30, 1981.

The parties do not appear to dispute that the 1980 lease was a binding contract that was enforceable under State law when it was originally executed in 1980.  The parties' disagreement focuses on whether the 1980 lease was still a binding contract with respect to the years 2005 and 2007.  Under New Jersey law, parties to a contract may modify, abandon, abrogate, or rescind a contract.  <u>Cnty. of Morris v. Fauver</u>, 707 A.2d 958, 965 (N.J. 1998).  We consider whether petitioners have proved by a preponderance of credible evidence that the 1980 lease was still

---

[9]Respondent would have us conclude that the ability to renew under the 1980 lease was limited to one additional term.  Neither the lease as drafted nor any principle of New Jersey law appears to support such a conclusion.

a binding contract in effect for taxable years ending in 2005 and 2007.

Under New Jersey law, the parties to a contract may make limited changes to the contract through modification, which can be done either by express agreement or by conduct. Id. at 967. For example, a landlord and tenant may alter the rent if the lease authorizes modification, the parties comply with any provisions regarding modification, and the modification is supported by consideration. Oscar v. Simeonidis, 800 A.2d 271, 276 (N.J. Super. Ct. App. Div. 2002).

Under New Jersey law, the parties may also rescind the initial contract in favor of a subsequent contract. Rosenberg v. D. Kaltman & Co., 101 A.2d 94, 96 (N.J. Super. Ct. Ch. Div. 1953). If the parties enter into a subsequent contract covering the same subject matter and the subsequent contract contains terms inconsistent with the initial contract, the subsequent contract rescinds the initial contract and "becomes the only agreement on the part of the parties on the subject matter." Id. The difference in terms, however, must be so inconsistent that the two contracts cannot stand together. Id.

Abandonment under New Jersey law refers to actions of parties to a formerly binding contract that demonstrate that the contract is no longer in effect. A court may infer abandonment from the surrounding circumstances. Mossberg v. Standard Oil Co.

of N.J., 237 A.2d 508, 516 (N.J. Super. Ct. Law Div. 1967). For example, in Mossberg, the Superior Court of New Jersey found that the parties had abandoned a formerly binding contract that the parties had executed 30 years before, on the basis of evidence that the parties had ignored the contract provisions during the period then in dispute. Id. at 515-516.

With these principles in mind, we examine the very sparse record for what it tells us about whether the 1980 lease was still in effect for 2005 and 2007. Regardless of the enforceability of the 1980 lease during the initial rental term, which the parties appear to assume, the record contains no credible evidence regarding the history and enforceability of the 1980 lease for periods between June 30, 1981, the end of the initial rental term, and November 30, 2004, the earliest fiscal year as to which there is evidence in the record of an allocation to rental expense by Mr. Sarva. With respect to 2005 and 2007, the record is replete with evidence demonstrating that petitioners, the medical corporation, and Mr. Sarva did not pay any attention to the terms of the 1980 lease. The parties to the lease ignored the lease provision with respect to the amount of required rent. The parties to the lease ignored the lease requirement that monthly rent payments be made. The term of the lease, which originally ran from July 1 through June 30, appears to have been changed to a term corresponding to the fiscal year

of the medical corporation.  Mr. Sarva, who drafted the 1980 lease and supervised its execution by petitioners and the medical corporation, did not consult the lease in making his annual allocation between petitioner's salary and rental income and his determination of the rental income included in petitioners' income, and the rental expense deducted on the medical corporation's returns for the taxable years ended in 2005 and 2007 did not coincide with what should have been reported under the 1980 lease if it were still in effect for those years.[10]  The record overwhelmingly demonstrates that, during the taxable years ending in 2004 through 2009, the 1980 lease was a meaningless document that was simply not followed by petitioners, the medical corporation, or Mr. Sarva, who implemented and supervised the rental arrangement.

Petitioners had the burden of convincing us that the 1980 lease was still a binding contract under New Jersey law in 2005 and 2007.  They failed to do so.  During the fiscal years ending 2005 and 2007, neither petitioners nor Mr. Sarva calculated the correct amount of rent due under the 1980 lease, and the medical

---

[10]In fact, Mr. Sarva did not include any rental income from the Westwood property lease on petitioners' 2006 and 2008 returns even though the medical corporation claimed a rental expense deduction on its returns for each of the related fiscal years. Petitioners argue that their failure to report rental income on their 2006 and 2008 returns was a mistake attributable to Mr. Sarva and should not be treated as evidence that the 1980 lease was no longer in effect.

corporation did not make the required monthly rental payments. The rental arrangement during those years was completely ad hoc-- the accountant determined the rent after the fact on the basis of his analysis of petitioner's financial situation at the time.  On these facts, we conclude that petitioners have not proved that the 1980 lease was a binding contract during 2005 and 2007. Because petitioners have not proved that the 1980 lease was a binding contract under New Jersey law and in effect for 2005 and 2007, petitioners have failed to prove that they qualify for transitional relief under section 1.469-11(c)(1)(ii), Income Tax Regs., and respondent's determination that the rental income petitioners reported on their 2005 and 2007 returns is nonpassive income under section 1.469-2(f)(6), Income Tax Regs., is sustained.

## II.  Accuracy-Related Penalty Under Section 6662

Section 6662 authorizes the Commissioner to impose a penalty on an underpayment of tax that is attributable to negligence or disregard of rules or regulations or any substantial understatement of income tax.  Sec. 6662(a) and (b)(1) and (2). The Commissioner bears the initial burden of production with respect to the taxpayer's liability for the section 6662 penalty. Sec. 7491(c).  At trial the Commissioner must introduce sufficient evidence "indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. at 446.

If the Commissioner satisfies his initial burden of production, the burden of producing evidence to refute the Commissioner's evidence shifts to the taxpayer, and the taxpayer must prove that the penalty does not apply.  Id. at 447.

Respondent contends that petitioners are liable for the accuracy-related penalties because the underpayments of tax are attributable to either negligence or disregard of rules or regulations (2005 and 2007) or to a substantial understatement of income tax (2007).  Respondent's contentions necessarily reflect alternative grounds for imposing the section 6662 penalty because only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of any underpayment, even if the underpayment is attributable to more than one of the types of listed conduct.  New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), affd. 408 Fed. Appx. 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

We turn first to respondent's contention that the section 6662 penalties should be imposed because the underpayments for 2005 and 2007 were attributable to petitioners' negligence.  See sec. 6662(a) and (b)(1).  For purposes of section 6662, negligence is any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard.  Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985)

(negligence is lack of due care or failure to do what a reasonably prudent person would do under the circumstances); sec. 1.6662-3, Income Tax Regs. Negligence also includes any failure to exercise ordinary and reasonable care in the preparation of a tax return, or any failure to keep adequate books and records and to properly substantiate items. Sec. 1.6662-3(b)(1), Income Tax Regs. A return position that has a reasonable basis is not attributable to negligence. Id.

Respondent introduced evidence at trial establishing that the rent paid by the medical corporation during 2005 and 2007 did not comply with the terms of the 1980 lease. Mr. Sarva's testimony confirmed that he made an allocation to rent at the end of each taxable year without regard to the terms of the 1980 lease. Nevertheless, petitioners took the position on their 2005 and 2007 returns that the 1980 lease was still binding and treated the 2005 and 2007 rental income as passive income under the transition rule of section 1.469-11(c)(1)(ii), Income Tax Regs. This evidence was sufficient to satisfy respondent's initial burden of production and shift the burden of production to petitioners. Petitioners did not prove that they were not negligent in treating their 2005 and 2007 rental income from the medical corporation as passive income under the transition rule of section 1.469-11(c)(1)(ii), Income Tax Regs. Because we hold that the underpayments were attributable to negligence, we need

not address whether a substantial understatement of income tax exists for either or both of the years at issue.[11]

We turn then to petitioners' contention that they are entitled to relief under section 6664(c) from the section 6662 penalties. A taxpayer may avoid liability for the section 6662 penalty if the taxpayer demonstrates that he or she had a reasonable basis for the underpayment and that he or she acted in good faith with respect to the underpayment. Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor in determining reasonable cause and good faith is the extent of the taxpayer's effort to assess his or her proper income tax liability. Id.; see also Woodsum v. Commissioner, 136 T.C. 585, 591 (2011).

A taxpayer may establish reasonable cause and good faith within the meaning of section 6664(c) if the taxpayer demonstrates that he or she reasonably relied in good faith on the informed advice of an independent professional adviser as to the proper tax treatment of an item. Sec. 1.6664-4(c), Income

---

[11]A substantial understatement of income tax exists with respect to an individual taxpayer if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). In any event, it would appear that a substantial understatement exists for 2007.

Tax Regs.; see also United States v. Boyle, 469 U.S. 241, 250 (1985); Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000), affd. 299 F.3d 221 (3d Cir. 2002). The taxpayer must show that: (1) The adviser was a competent and qualified professional who had sufficient expertise to justify the taxpayer's reliance, (2) the taxpayer provided all necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment in deciding on the proper tax treatment of the item. See Neonatology Associates, P.A. v. Commissioner, supra at 99.

Mr. Sarva has been a practicing C.P.A. for over 30 years. He has extensive experience in tax planning and return preparation[12] and has advised clients with respect to real estate transactions.[13] Petitioners relied on Mr. Sarva's judgment in purchasing the Woodside property in 1979, in setting up the leasing transaction, and in preparing their and the medical corporation's tax returns each year. Given Mr. Sarva's credentials and the longstanding professional relationship between petitioners and Mr. Sarva, we find that petitioners were justified in relying on Mr. Sarva.

---

[12]Mr. Sarva testified that he serves approximately 180 clients residing in 17 States.

[13]Mr. Sarva also has real estate investment experience.

Petitioners depended upon Mr. Sarva to handle their books and records and those of the medical corporation, to advise them on their tax situation, and to prepare their tax returns.  Mr. Sarva was either in possession of all necessary information and records, including a copy of the 1980 lease, to perform his work for petitioners and the medical corporation competently or could get access to the information through petitioners.

Finally, we are satisfied that, even though petitioners did not testify, they nevertheless relied in good faith on Mr. Sarva's judgment regarding the proper tax treatment of the 2005 and 2007 rental income.  Mr. Sarva testified that he made all of the rental expense allocations and that he determined that petitioners' rental income during 2005 and 2007 constituted passive income.  Petitioners had no reason not to trust the judgment of Mr. Sarva, who has served as their tax professional for over two decades.

Under the circumstances, we find that petitioners reasonably relied in good faith on Mr. Sarva's advice and judgment as reflected on petitioners' 2005 and 2007 returns.  We conclude therefore that petitioners are not liable for the section 6662 accuracy-related penalties for 2005 and 2007.

We have considered the parties' remaining arguments and, to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for respondent as to the deficiencies and for petitioners as to the accuracy-related penalties under section 6662(a).